No. 21888.

WESTERN FEDERAL SAVINGS AND LOAN ASSOCIATION OF
DENVER *v.* NATIONAL HOMES CORPORATION.
(445 P.2d 892)

Decided October 7, 1968.

HEISTER, TANNER and CLANAHAN, CHARLES B. LINDLEY, DAWSON, NAGEL, SHERMAN & HOWARD, WINSTON S. HOWARD, JAMES L. CUNNINGHAM, for plaintiff in error.

GORSUCH, KIRGIS, CAMPBELL, WALKER and GROVER, CHARLES E. RHYNE, RICHARD B. HARVEY, for defendant in error.

*En Banc.*

MR. JUSTICE GROVES delivered the opinion of the Court.

THE plaintiff in error, referred to as "Western," brought an action against the defendant in error, referred to as "National," in which it sought a decree determining that mechanics' liens asserted by National were released by lien waivers which National had delivered to Western prior to the filing of the liens. The trial court held that the lien waivers were not supported by consideration; that failure to recognize National's liens would result in unjust enrichment of Western; and that National's mechanics' liens were valid. We find that there was consideration for the lien waivers.

In 1962 Symphony Homes, Inc., referred to here as "Symphony," was engaged in the construction and sale of houses in a subdivision. Western desired and committed itself to finance both the construction and purchase of these houses. The *modus operandi* was along the following lines: The walls and some other portions of the houses were sold by National to Symphony as a "package." Symphony had a number of model houses. A prospective purchaser would select the house he wished to purchase from the models and a contract of sale and purchase would be made between Symphony and the purchaser, being conditioned upon the approval of a loan. The purchaser was then sent to Western to apply for the loan. Upon approval of the loan, Western would issue a loan commitment for the permanent loan to be made to the purchaser and would take the note and deed of trust of Symphony upon the lot involved to secure the construction loan being made to Symphony. Symphony would then commence construction of the purchaser's house. As construction proceeded, Western would advance sums to Symphony. At an appropriate time National would deliver its package, the walls would be erected very quickly, and Western on behalf of Symphony would pay National for the package. Upon completion of a house in 60 to 90 days from the time construction started, the permanent loan by Western to the purchaser would be made, usually being for an amount equal to the sales price less small down payment made by the purchaser at the time of execution of the sales contract. In each instance the amount of the construction loan was about 80% of the amount of the permanent loan. Symphony would receive the amount of the permanent loan, less the amounts retained by Western to pay the construction loan in full and to pay itself fees.

By late summer of 1962 Symphony was beginning to experience financial problems and was not paying its

construction accounts promptly. During the fall Western made an audit of Symphony's books to determine its condition and needs.

National maintained offices at Tyler, Texas and Lafayette, Indiana, and its management decisions were made by its representatives at those offices. In November and December 1962, Symphony's officers approached representatives of National at Tyler and at Lafayette for aid. Symphony first requested of National a loan of $100,000 to be used as working capital. National was reluctant to make such a loan, but it is apparent that it was desirous of a continuance of its sale of packages to Symphony and of attempting to be of some aid in the matter. Mr. Kraut of National and Mr. Alexander of Western were in telephonic contact. According to Mr. Kraut, Mr. Alexander advised that, based on Western's audit, Symphony needed between $30,000 and $40,000 working capital. National concluded that it would come to Symphony's aid by giving it a "bank letter of credit," the effect of which would permit Symphony to draw from Western the amount of the sales price of a National package and Symphony could delay for 60 days the payment to National therefor. National gave Symphony's representatives a suggested form of this letter of credit and the representatives brought it to Denver and presented it to Western. Western refused to accept this and prepared and presented to Symphony documents which it suggested be used. These documents, a set of which were to be used with respect to each house constructed in the future, consisted of (1) a letter from Western to National, (2) an assignment from Symphony to National and (3) a lien waiver by National. These forms were used without modification. A set of these as later completed and used in connection with one transaction is as follows (eliminating most of the contents of Western's letterhead in the first document):

(The Letter)

"WESTERN FEDERAL SAVINGS

"December 12, 1962
Our 72nd Year

"Mr. Rufus Smith
National Homes Corporation
Tyler, Texas
　"Re:　James A. Owens & Barbara J. Owens
　　　7604 Reed, Arvada, Colorado
"Dear Mr. Smith:

"Please be advised that we have approved a loan in the amount of *$16,050.00* to the above referenced persons to be secured by a first Deed of Trust on the above referenced real estate.

"We are advised that Symphony Homes, Inc. desires to assign to you all its right, title and interest in and to *$3236.07* of the proceeds of the subject loan.

"In consideration of the execution of the enclosed lien waiver and return to us, we hereby consent to such assignment to the extent that Symphony Homes, Inc. has such interest in said loan proceeds and we agree to pay such interest to National Homes Corporation upon closing of the loan above captioned, whether such closing occurs on or before 60 days or at a later date.

"Yours very truly,
WESTERN FEDERAL SAVINGS AND
LOAN ASSOCIATION OF DENVER
By Edwin G. Alexander

"Above Terms Accepted:
NATIONAL HOMES CORPORATION
By T. H. Kraut, Cr. Mgr.

(The Assignment)

"Date: December 19, 1962

"National Homes Corporation
Tyler, Texas
"Gentlemen:

"For good and valuable consideration, the undersigned, Symphony Homes, Inc., hereby assigns all of its right,

title and interest to National Homes Corporation in and to *$3,236.07* of the proceeds from Western Federal Savings and Loan Association's loan in the amount of *$16,050.00* to

James A. Owens & Barbara J. Owens.

(Name)

7604 Reed, Arvada, Colorado

(Address)

"SYMPHONY HOMES, INC.

By S. J. Houlihan

(The Lien Waiver)

"Date: December 19, 1962

"LIEN WAIVER

"Re: *Symphony Homes, Inc.*

Address *7152 W. 76th Avenue, Arvada, Colo.*

House Model *#Denver 2B Des 934*

"In consideration of the Assignment by Symphony Homes, Inc. of its right, title and interest in and to *$3236.07* of the proceeds of the above referenced loan commitment from Western Federal Savings and Loan Association of Denver, receipt of which Assignment is hereby acknowledged, NATIONAL HOMES CORPORATION hereby releases all right to claim a lien as provided by law against the described property for all material furnished or work done, and warrants that all laborers employed by the undersigned upon the said premises have been fully paid, and that all supplies and materials furnished to the undersigned for use upon the said premises have been fully paid for, and that no such laborer, supplier or materialman has a demand claim or lien against said premises.

"Property Address 7604 Reed, Arvada, Colorado

Legal Description Lot 1, Block 9, Parkway Estates

Filing #1

"NATIONAL HOMES CORPORATION

By Warren W. Baumgart

Credit Mgr."

Western gave the forms to Symphony, whose representatives took them to National. It was proposed that with the use of these documents the payment for a National package would be made to Symphony instead of National, thereby adding to Symphony's working capital. There were discussions between Symphony and National as to how Symphony would effect economies in its operations. Mr. Kraut, National's credit manager, testified that the effect of the new transaction "would be that they [Symphony] would get the use of the profit during the early stages of the construction." He further testified that Mr. Alexander had told him that there was another principal supplier who had not been paid and "either said or implied that it was M.O.D. * * * The land supplier, M.O.D." As can be seen from *Western Federal Savings and Loan Association v. M.O.D., Inc.,* 164 Colo. 189, 441 P.2d 670, and as appears to a certain extent in the record in this case, M.O.D., Inc., had an assignment from Symphony of permanent loan proceeds in the amount of $2,700 with respect to each tract.

It is to be noted that the documents contemplated that National was to be paid upon completion of the house and the closing of the loan to the purchaser. Apparently there was no discussion concerning a situation wherein there would not be enough money in the loan proceeds completely to satisfy National's claim. Mr. Kraut, National's credit manager, testified that he assumed that Western would be watching construction costs and would so handle disbursements to the end that there would be sufficient money available for National. National agreed to the new type of transaction and with the use of the documents as prepared by Western.

Thereafter, commencing in early December and continuing for a few weeks 12 sets of these documents were used and National furnished 12 packages, involving an aggregate price for all packages approximately of $45,000, none of which National has received.

To revert to the earlier stages of this situation, there

were construction loan agreements between Western and Symphony embracing future financial arrangements of these houses. These agreements, and the one in effect with respect to the houses here involved, contained the following provision as to management of funds:

"To use such funds placed with The Association [Western] in a construction loan account, together with the net proceeds of the loan, as hereinbefore set forth for the payment of material and labor and for other uses and purposes in and for the construction of said buildings, which funds are hereby assigned to the Association for such purpose and are to be disbursed by the Association in its uncontrolled discretion as it deems necessary or proper during construction. * * *

"That the proceeds of this loan are to be used solely for material and labor used in and applied upon the erection of the building or buildings hereinbefore referred to. The Association is further expressly authorized to pay from the undisbursed principal amount of the loan the monthly interest payments due on the note evidencing said loan and any other payments agreed to in the Deed of Trust securing said note."

In February 1963, Western concluded that it was no longer going to finance Symphony. At that time and continuing into the month of May and in some instances even into the month of June, Western held a credit balance in the several construction loan accounts of Symphony. Symphony was not in default under any of its construction notes and deeds of trust in February 1962. From these borrowed moneys of Symphony which Western was holding, Western had been paying itself interest as well as other items, including "draws" by Symphony. In each of the 12 construction loans here involved Western had paid itself interest on February 28, 1963. On March 4, 1963 it reversed each of these entries and simultaneously "took over" the 12 properties. National concluded, and we agree, that the reason for reversing these entries was to produce evidence of de-

fault on Symphony's part. From March 4, 1963, Western has been in possession of the 12 tracts and has exercised exclusive control over them. Under date of March 21, 1963 Symphony exercised and delivered deeds conveying the 12 tracts (and nine others for which National had not furnished packages) to the H.T.C. Escrow Company, herein referred to as "H.T.C." The name H.T.C. was taken from the first letters of the name of Western's law firm Heister, Tanner & Clanahan. While Symphony gave some written instructions to H.T.C. which might be interpreted somewhat otherwise, H.T.C. has at all times held title subject to instruction of Western and, as stated, Western has been in control.

Shortly following March 4, 1963 National protested to Western that it was entitled to payment from Western from loan proceeds. Western advised National to the effect that by reason of the lien waivers National had no rights except as against Symphony, which apparently had and has nothing with which to satisfy National's claims. Western then denied, and now denies, that it owed any obligation to National. National then filed notices of mechanics' liens with respect to the 12 properties.

Other construction creditors of Symphony filed mechanics' liens and Western settled with them, and obtained assignments of lien claims. Western completed all uncompleted structures on the properties and entered into rental or option agreements with the purchasers from Symphony and others. Western was unable to sell the 12 houses because of the unreleased notices of mechanics' liens of National. It has leased the properties. The statement was made in oral argument that at the time of trial in April 1965, Western had collected $15,000 in rentals and in payments upon options to sell the properties.

As stated at the beginning of this opinion Western brought this action to dispose of the National mechanics' liens. National filed an answer and several counter-

claims, pleading among other defenses and counterclaims that: (a) There was no consideration for the lien waivers; (b) The waivers were executed and delivered upon the condition that National was to be paid out of loan closings and, closing not having occurred, the waivers were void; (c) Western, by acceptance of the assignments in favor of National, became a trustee of an implied trust in favor of National; (d) Western impliedly agreed to close the loans to purchasers, to disburse amounts assigned to National and, in failing so to do, breached an implied warranty or contractual obligation in favor of National; and (e) Western negligently and carelessly failed properly to supervise the loan disbursements. National prayed for the appointment of a receiver.

Parenthetically, it might be stated that many of these defenses and counterclaims were not raised by M.O.D., Inc., in *Western Federal Savings and Loan Association v. M.O.D., Inc., supra.*

Following trial the district court made findings to the following effect:

That National had added to Western's security; that Symphony was the actual owner of the properties, H.T.C. not being a bona fide purchaser; that National derived no benefit from the lien waivers; lien waivers were unsupported by consideration and of no legal effect; that National is entitled to restitution; that Western will be unjustly enriched if it is permitted to set up the lien waivers as a defense; and that National's mechanics' liens are prior to Western's deeds of trust.

The court decreed that the individual properties should be sold separately at public auction with the proceeds applied first to the payment of liens of National and the liens obtained under assignment by Western, with the funds next to be applied to the liens of Western's deeds of trust.

The principal basis for National's success in the trial court was the finding of no consideration. How-

ever, there was consideration. It is apparent that the reason that National entered into this arrangement was that it wished to continue to sell its packages to Symphony, and to do this it had to satisfy Western in order for the latter to continue financing. Western went ahead with the financing for awhile and during that period Symphony continued in business. For a few weeks National was able to sell some more of its packages. These items of consideration were not equal to the performance of National and it may be that National will receive nothing for its 12 packages. Nevertheless, legally there was consideration. A benefit to the promisor or a detriment to the promisee can constitute consideration, however slight. *Gertner v. Limon National Bank*, 82 Colo. 13, 257 P. 247; *Dyer v. McPhee*, 6 Colo. 174. Consideration is not to be measured in the light of the eventual success or failure under a contract but rather consideration is measured as of the time of making the contract, *Casserleigh v. Wood*, 119 F. 308. When Symphony was getting into financial trouble and needed help National was bound to realize that there was a hazard when it concluded to obtain its money from any profits remaining to Symphony, particularly considering that it had reason to believe that M.O.D., Inc., the land supplier, also had to be satisfied from profits.

██ Since there was consideration, the doctrine of unjust enrichment cannot be used as a basis to nullify the lien waivers. For analogous authority see 27 Am. Jur. 550-51. Also, with consideration present the other findings of the trial court do not justify the determination that National is entitled to restitution. Lending institutions are entitled to, and indeed must, protect themselves in the manner Western did when it insisted on the lien waivers. We hold the lien waivers to be valid and effective.

█ Western's conduct commencing on March 4, 1963 is not to be commended. With respect to the 12 properties, at the least, National is entitled to judgment against

Western for the amount, if any, of the permanent loan commitments less the amounts of Western's outlays as to such properties prior to March 4, 1963 and less its proper outlays as to the same on and after March 4, 1963.

It is possible that National may be entitled to further relief. The trial court has not passed on certain of the counter claims asserted by National, including *inter alia* those to the effect that Western became a trustee under an implied trust; and that Western negligently and carelessly supervised disbursements. Some or all of these counterclaims relate to application of construction loan proceeds as well as permanent loan proceeds. We make no indication as to whether any of these counterclaims have any merit.

In the present posture of this action the parties are not entitled to introduce further evidence as to questions of liability. The entire trial record as it now exists will be determinative in these respects. Offhand, it seems to us that no further evidence need be taken but, conceivably, the trial court might be obliged to do so on matters such as damages or propriety of outlays in order to comply with this opinion.

The judgment is reversed and the cause remanded with instructions to the trial court to proceed in a manner consonant with the views expressed in this opinion and to make a determination of those issues presented by the pleadings and upon which rulings have not heretofore been made to the extent necessary to enter a final judgment.