**Roger DeJEAN, Thomas Green, Kim Kropat, and John Yackus, as members and representatives of the class herein defined, Petitioners,**

v.

**UNITED AIRLINES, INC., Respondent.**

**No. 91SC321.**

Supreme Court of Colorado,
En Banc.

Oct. 13, 1992.

---

Coghill & Goodspeed, P.C., H. Thomas Coghill, David J. Richman, Denver, Lewis & Roca, Marty Harper, Allen R. Clarke, Janet Napolitano, John P. Frank, Phoenix, Ariz., for petitioners.

O'Melveny & Myers, Robert A. Siegel, Tom A. Jerman, Debra L. Boyd, Los Angeles, Cal., Seyfarth, Shaw, Fairweather & Geraldson, Joel H. Kaplan, Gary S. Kaplan, Cynthia C. Mooney, Chicago, Ill., Dubofsky & Phelan, Jean E. Dubofsky, Boulder, for respondent.

Chief Justice ROVIRA delivered the Opinion of the Court.

This case involves the validity and scope of claim releases signed in 1987 by petitioners, a group of 570 pilots ("Group of 570" or "Group"), releasing and discharging claims against their employer, United Airlines, Inc. (United). After signing the releases, the Group of 570 filed suit against United seeking damages based on promises relating to seniority made to them in late 1984 and early 1985. The Denver district court granted summary judgment for United, finding that the Group's claims were barred by the 1987 releases and by the doctrine of *res judicata*. The court of

appeals, not reaching the issue of *res judicata,* held that the releases effectively barred the claims and affirmed the trial court. Because we agree that the releases are enforceable and encompass the Group's claims, we affirm the court of appeals.

I

In 1984 and 1985, United was negotiating a collective bargaining agreement with the Air Line Pilots Association, International (ALPA). In the negotiations, United sought a lower pay scale for newly hired pilots. At that time, United selected at least 570 pilots for entry into a pre-training program.[1] United desired to place these pilots on the lower pay scale and to employ them, if at all, on an "as-needed" basis after the airline reached an agreement with ALPA. These terms were set out in the Flight Officer Training Agreements ("Training Agreements") which were signed by the members of the Group of 570. The Training Agreements specifically stated that the pilots were not hired as employees when they entered the program, and would not be paid any salary during the pre-training program, but would be reimbursed $30 per day for expenses. The Training Agreements further provided that the graduates of the pre-training program would constitute a pool of trained candidates for potential employment within twelve months of graduation, as needed by United. Additionally, the Training Agreements provided that, if the pilot was so employed, the employment could be terminated without advance notice. At the time training began, United allegedly promised the pilots that, upon hire, their seniority date would coincide with their original training date and they would not be required to cross picket lines if a strike occurred.[2]

In April 1985, United began the process of offering employment to each member of the Group of 570. United told the Group of 570 that their employment would commence on May 17, 1985, the first day ALPA was authorized to strike under the Railway Labor Act, 45 U.S.C. §§ 151–188 ("the RLA"). Not wishing to cross the picket lines, the Group of 570 did not report to work on that date. Due to their refusal, United hired approximately 539 replacement pilots to work during the strike. One day prior to the strike, May 16, 1985, ALPA initiated suit against United in the United States District Court for the Northern District of Illinois, alleging *inter alia,* that United's threatened refusal to hire the Group of 570 if they honored the strike violated the RLA.

In June 1985, United and ALPA reached a tentative back-to-work agreement, and after ratification of the agreement the strike ended. At this time, United refused to hire the Group of 570. The back-to-work agreement provided in part that the claims of the Group of 570 would be pursued by ALPA in the pending federal action. During that litigation, United maintained that the Group of 570 were never "employees" under the RLA subject to representation by ALPA. However the federal district court found that, as of May 17, 1985, the Group of 570 were "employees" of United and thus protected by the RLA. The district court ultimately ordered United to put the Group of 570 to work as job openings became available, and to affix a seniority date of May 17, 1985, for all Group members. *Air Line Pilots Ass'n, Int'l v. United Air Lines, Inc.,* 614 F.Supp. 1020, 1043–44 (N.D.Ill.), *modified,* 616 F.Supp. 849, 852 (1985). United appealed.

In September 1986, after all the Group of 570 members began working for United, the Seventh Circuit reversed the lower court and held that the Group of 570 were not employees on May 17, 1985.[3] *Air Line*

---

1. The Group of 570 is a subgroup of the new hires that did not work during a strike in May and June of 1985.

2. Seniority dates greatly affect the career of an airline pilot because they determine pay scale, scheduling, flight routes and promotional eligibility.

3. Referring to the Group of 570 as the "Group of 500," the Seventh Circuit found that, because the Group never performed any work for United and never submitted to United's supervision of them in their work, the members of the Group were not employees within the definition of the RLA on May 17, 1985, and that the district court

# 1156 

*Pilots Ass'n, Int'l v. United Airlines, Inc.,* 802 F.2d 886 (7th Cir.1986), *cert. denied,* 480 U.S. 946, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987).

After the Seventh Circuit ruling (but before the issuance of a mandate), ALPA and United entered into a Letter of Agreement concerning the Group of 570 ("1987 Agreement"). The 1987 Agreement provided in pertinent part:

> WHEREAS, the parties wish to enter an agreement for the purpose of fully, finally and forever resolving any and all disputes between the Company and Association arising out of or connected with the employment status of the "Group of 570";
>
> ....
>
> WHEREAS, until the mandate is issued by the Seventh Circuit, the "Group of 570" are being maintained in employment as United pilots pursuant to court order; and
>
> WHEREAS the Association [ALPA] is the recognized bargaining representative for the "Group of 570" while they remain employed as United pilots pursuant to court order; and
>
> WHEREAS the Association realizes that the portion of the court order that pertained to and required the Company to employ the "Group of 570" following the 1985 strike will be vacated;
>
> NOW, THEREFORE, it is mutually agreed as follows:
>
> 1. The company agrees that it will immediately extend offers of employment to each member of the "Group of 570" for a position as a United pilot; ...
>
> 2. The Company shall adjust the seniority date for each "Group of 570" member from May 17, 1985, to the actual "recall" date of the 1st member of the "Group of 570" (11/9/85) in accordance with the original order of the District Court, as reflected in the attached list approved by the Association. ...
>
> 3. The Association agrees that the seniority dates and numbers assigned to the "Group of 570" by the Company in

accordance with the provisions of Paragraph 2 above, shall be final. The association agrees that it will never seek to challenge the Company's action in that regard in court or before an arbitrator, nor will it seek to raise or raise the issue of the "Group of 570" relative seniority position as part of future negotiations. ...

> 4. Each member of the "Group of 570" will be required to sign a written release in the form of Attachment "A" if he/she accepts the employment offer in Paragraph 1 above. ... It is agreed that the release does not affect rights pursuant to FOTI litigation brought in court in Colorado nor does it apply to members of the "Group of 570" who are currently discharged who have litigation pending. ... Refusal to return a signed release to the Company within 15 days of receipt will result in permanent separation.
>
> ....
>
> 7. A "Group of 570" member who does not accept the employment offer as specified herein but who signs the release in Attachment "A" within 15 days of receipt of his employment offer, will promptly receive a special allowance of one month's pay at the pilot's then-effective rate of pay, together with all other benefit accruals due on separation under the pilots' agreement.

The release, attached to the 1987 agreement, stated:

> In accordance with the provisions of Paragraph 4 of the LETTER OF AGREEMENT ..., the undersigned member of the "Group of 570" hereby forever releases and discharges the Company and the Association (ALPA), and their respective officers, agents, employees and affiliates from any and all liabilities, claims, awards, assessments, lawsuits, judgments or damages arising out of or in any way relating to the Agreement or to my period of employment as a "Group of 570" United pilot pursuant to the court order.

*Air Lines, Inc.,* 802 F.2d 886, 911–13 (7th Cir. 1986).

erred, as a matter of law, in concluding that they were. *Air Line Pilots Ass'n, Int'l v. United*

Each member of the Group of 570 received a copy of the 1987 Agreement and a release form ("1987 release"). Virtually all members of the Group signed and returned a release.

Subsequently, the Group of 570 initiated this suit against United, asserting claims for breach of contract, promissory estoppel, fraudulent misrepresentation and negligent misrepresentation arising out of promises allegedly made to them during the pre-training period regarding seniority dates. Specifically, the Group's breach of contract claim alleges that United offered them employment at the beginning of their training session conditioned only upon an agreement with ALPA and increased pilot need as projected. At that time, they allege, United promised them seniority based on their initial training dates and told them that they would not be required to work in the event of a strike. The Group alleges that these employment offers were accepted, forming a binding contract which United unilaterally altered by requiring the Group of 570 to work during the strike. When the Group refused to accept these unilateral changes, they assert, United breached the contract by employing replacement pilots first and assigning them seniority over the Group of 570. The Group's claims for promissory estoppel, fraudulent misrepresentation and negligent misrepresentation, also relate to the Group's adjusted seniority rights.[4]

The trial court granted United's motion for summary judgment, finding that the doctrine of *res judicata* barred this action because the state law claims of the Group "could have been raised in the prior federal action pursuant to the federal courts [sic] pendent jurisdiction," and that the Group's interests were adequately represented by ALPA in that case. Additionally, the trial court ruled that the claims made by the Group of 570 are within the scope of the 1987 Agreement and releases, that the re-

leases were supported by adequate consideration, and that the Group members did not sign the releases under duress. Finally, the court refused to equitably estop United from enforcing the 1987 Agreement and releases, finding that the Group "cannot accept the benefits of the [1987 Agreement and releases] including continued employment with [United] and, at the same time, attempt to assert estoppel predicated on alleged representations which occurred prior to the time of the execution of the agreement and releases, where the very representations complained of were specifically settled by those documents."[5] The court of appeals affirmed. Without reaching the issue of *res judicata*, it held that the releases effectively barred the Group from pursuing their present claims. It found that the 1987 Agreement and releases were supported by mutual promises—United's retention of the Group with adjusted seniority dates in exchange for the Group's relinquishment of legal action relating to their period of employment. Additionally, the court of appeals held that the releases were not signed under either duress or threat of discharge and that the releases encompassed a dispute such as this.

## II

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. C.R.C.P. 56(c); *Casebolt v. Cowan*, 829 P.2d 352, 354 (Colo.1992). Agreements exculpating one contracting party from liability have been held enforceable. *See Heil Valley Ranch, Inc. v. Simkin*, 784 P.2d 781, 784 (Colo.1989) (considering contract provision exculpating party from liability for negligence). If the releases are enforceable and applicable to the claims asserted here, they would entitle United to judgment as a matter of law, rendering summary judgment

---

**4.** United had the case removed to the United States District Court for the District of Colorado. That court, finding that the case was not preempted by the RLA and that the defenses asserted by United were available in state court, remanded the case to Denver district court.

**5.** The court denied United's request for summary judgment on the basis of federal preemption by the RLA.

appropriate. Therefore, we first consider the validity of the 1987 releases and then examine whether the claims asserted fall within the scope of these releases.

### A

The Group of 570 asserts that the 1987 releases are invalid because they (1) were not supported by valid consideration, and (2) were secured through duress.

The Group contends that United had an obligation to employ them arising, not under the federal court order, but either under a contract formed as a result of United's pre-employment promises, or under Colorado statutory labor provisions. Thus, they urge that by extending employment in the 1987 Agreement United offered nothing new in exchange for signing the releases. In response, United argues that at the time the releases were obtained United and ALPA had just completed two years of litigation concerning whether United was obligated to employ the Group of 570. United urges that reversal of the federal court order to employ the pilots clearly gave United the right to terminate the employment of the Group of 570, and the releases were therefore obtained in exchange for an offer of employment. Alternatively, United urges that if, as a result of pre-training promises and employment offers, the right to terminate pursuant to the Seventh Circuit decision was not clear, it was the subject of a reasonable and honest dispute and the airline's offers of employment in the 1987 Agreement constituted adequate consideration. The court of appeals found that the Seventh Circuit holding gave United the right to terminate the Group of 570 and, therefore, the offer of employment in the 1987 Agreement constituted sufficient consideration for execution of the releases.

■ Although a promise to perform an existing legal obligation does not constitute consideration, *Richardson v. Jordan*, 95 Colo. 56, 32 P.2d 826, 827 (1934), if the

existing legal duty which one promises to perform is either "doubtful" or "the subject of honest dispute," it can constitute consideration. *Restatement (Second) of Contracts* § 73 (1981). Additionally, the presence of consideration must be examined as of the time the 1987 releases were signed. *See Western Fed. Sav. & Loan Ass'n v. National Homes Corp.*, 167 Colo. 93, 103, 445 P.2d 892, 897–98 (1968).

■ We reject the Group's contention that, at the time the releases were signed, United was indisputably obligated to hire the Group of 570 on the basis of a contract formed in 1984 and 1985. Although the Group claims employment rights based on concepts of contract prior to employment mandated by the federal court order, there is little doubt that employment of the Group of 570 was the result of that order.[6] We find that United's obligation to employ the Group of 570 after the Seventh Circuit opinion reversing the trial court's order of employment is, at the very least, the subject of honest dispute.

The existence of a dispute as to the employment status of the Group of 570 was acknowledged in the 1987 Agreement. The 1987 Agreement states: "[T]he parties wish to enter an agreement for the purpose of fully, finally and forever resolving any and all disputes between the Company and Association arising out of or connected with the employment status of the 'Group of 570'...." In the agreement ALPA recognized that "the portion of the court order [requiring United] to employ the 'Group of 570' ... will be vacated." Thus, United was to "extend offers of employment to each member of the 'Group of 570'...."

Finally, the existence of a dispute is further evidenced by the assertions and counter-assertions made before this court regarding United's obligation to employ the Group members under state common law contract principles. Had United terminated the Group of 570's employment immediately following the Seventh Circuit deci-

---

6. In his affidavit, John R. Samolis, Vice President of Employee Relations for United Airlines, stated that the Group of 570 was hired only because the district court had ordered the air-

line to do so. The Agreement itself provides support for this position, stating that "the 'Group of 570' are being maintained in employment as United pilots pursuant to court order."

sion, and the Group had sued United for damages under state law, there is no question that the parties could have settled that lawsuit by an offer of immediate employment. This offer of employment would have amounted to adequate consideration for a release of the Group's state law claims. We find no reason to treat a resolution of a dispute before a lawsuit differently. *See Davis v. Flatiron Materials Co.,* 182 Colo. 65, 71–72, 511 P.2d 28, 32 (1973) (public policy favors settlement of disputes; if releases and settlements may be lightly ignored then parties would be discouraged from settling because of uncertainty as to their finality).

The Group of 570 next asserts that United's obligation cannot be doubtful because United had an obligation to employ them under Colorado statutory provisions prohibiting obtaining workers by misrepresentation, § 8–2–104, 3B C.R.S. (1986), and prohibiting coercion of employees by discharge or threatened discharge if the employees join or become connected with a labor organization, § 8–2–102, 3B C.R.S. (1986). We do not agree that these statutory provisions required United to hire the Group members.

Section 8–2–104, in relevant part, prohibits any person, company or corporation from inducing, influencing, persuading, or engaging workers to change from one place of employment to another in this state or to bring workers into this state to work through or by means of false or deceptive representations or false pretenses regarding:

> the existence or nonexistence of a strike or lockout pending between employer and employees, or failure to state in any advertisement, proposal, or contract for the [sic] employment that there is a strike, lockout, or other labor trouble at the place of proposed employment, when in fact, such strike, lockout, or other labor trouble then actually exists at such place....

§ 8–2–104, 3B C.R.S. (1986). The statute, by its plain language, specifies that the presence of the strike, lockout, or other labor trouble must be pending—in actual existence. At the time the Group members entered the training program, there was no labor dispute between United and its pilots, although the potential for such a dispute did exist because the airline was negotiating a new collective bargaining agreement with the pilots' union. Additionally, since there is no dispute that United informed the Group members that it was training them for employment after a new labor agreement was signed, the Group cannot now claim that United induced them to work under false pretenses concerning the status of the airline's relationship with the labor union.

Section 8–2–102 provides:

> It is unlawful for any individual, company, or corporation or any member of any firm, or an agent, officer, or employee of any company or corporation to prevent *employees* from forming, joining, or belonging to any lawful labor organization, union, society, or political party, or to coerce or attempt to coerce *employees* by discharging or threatening to discharge them from their employ or the employ of any firm, company, or corporation because of their connection with such lawful labor organization, union, society, or political party.

§ 8–2–102, 3B C.R.S. (1986) (emphasis added). This statutory provision, again by its plain language, prohibits coercion of *employees* by discharge or threat of discharge due to participation in organized labor activities. The statute does not, however, create an obligation on employers with regard to potential employees.

The term employee is defined by statute to include "every person in the service of an employer, under any contract of hire, express or implied...." § 8–1–101(6), 3B C.R.S. (1986). The employment offers extended by United stated that employment was to commence on May 17, 1985. Thus, we hold that in failing to report to work on May 17, 1985, the Group of 570 was not acting in the service of United. Consequently the Group of 570 were not employees of United protected by section 8–2–102.

Contrary to the Group of 570's assertions, sections 8–2–104 and 8–2–102 do not

require United to employ the Group of 570 at the time the releases were signed.

We hold that United, by offering employment when it was not legally obligated to do so, provided the pilots with a benefit in exchange for signing the releases. Thus, the releases are supported by consideration. *See Western Fed. Sav. & Loan Ass'n,* 167 Colo. at 103, 445 P.2d at 897 ("A benefit to the promisor or a detriment to the promisee can constitute consideration, however slight.").

The Group of 570 also asserts that United's threat to terminate the "employment"[7] of the pilots unless they signed the releases makes the releases unenforceable because they were secured under duress. Specifically, the Group argues that there was no negotiation with the pilots over the releases, United threatened to fire any pilot who did not sign and return a release within the specified time, and the pilots were coerced by threats to sign the releases.

■ A contract made under duress is not void, but voidable. *Miller v. Davis' Estate,* 52 Colo. 485, 494, 122 P. 793, 796 (1912); *Restatement (Second) of Contracts* § 175 (1981). Section 175(1) of the *Restatement (Second) of Contracts* states: "If a party's manifestation of assent is induced by an improper threat by the other party that leaves the victim no reasonable alternative, the contract is voidable by the victim." Section 176(1) provides that "[a] threat is improper if (a) what is threatened is a crime or a tort...." The Group of 570 relies on the Restatement of Contracts for an illustration of the applicable duress principle:

A makes a threat to discharge B, his employee, unless B releases a claim that he has against A. The employment agreement is terminable at the will of either party, so that the discharge would not be a breach by A. B, having no reasonable alternative, releases the claim. A's threat is a breach of his duty of good faith and fair dealing, and the release is voidable by B.

*Restatement (Second) of Contracts* § 176 cmt. e, illus. 11 (1981).

■ We find the facts before us here are not analogous to illustration 11 as is urged by the Group of 570. Comment e to section 176, from which the illustration is taken, concerns the threat of a party to breach a contract. Here United obtained the releases not under a threat to breach a contract—"a threat of discharge," but rather under a threat to exercise the rights granted to it by the Seventh Circuit. Such a threat is not improper. At the time the Agreement was entered into United had the right to terminate the employment of the Group of 570, and as we have noted before, "[i]t is neither coercion or duress to threaten to do what one has a legal right to do." *Miller,* 52 Colo. at 494, 122 P. at 796. *See also Cooper v. Flagstaff Realty,* 634 P.2d 1013, 1015 (Colo.App.1981) (not duress where one party makes an effort to obtain that to which they were colorably entitled).

Finally, we note that the Group was not obligated to accept the terms of the 1987 Agreement and releases, but had the alternative of asserting a common law claim for damages as they are here attempting to do. We find that the Group was not without reasonable alternative recourse. Instead of accepting the terms of the 1987 releases, and thus enjoying the benefit of continued employment, the members could have refused to sign the releases and then pursued these state law claims against United. Thus, this challenge to the validity of the releases fails.

### B

■ The second claim of the Group of 570 is that the releases, which barred claims "arising out of or in any way relating to the [1987] Agreement or ... period of employment as a 'Group of 570' United pilot pursuant to the court order," do not encompass the state law damage claims asserted here. The Group of 570 urge that these claims do not relate to the 1987 Agreement or the period of employment as a result of the court order, but relate to the

---

**7.** This is the employment resulting from the federal district court order in 1987.

misrepresentations made long before the Agreement and releases were executed.

The issue is whether the Group of 570's claims asserted in this action "in any way [relate] to the Agreement or [the Group of 570's] period of employment as a ... United pilot pursuant to the [federal] court order."

The basis of the Group's claims in this action is that United shifted the relative seniority of the Group of 570 and the 539 replacement pilots, thereby breaching United's alleged pre-strike promises to the Group of 570 that they would be the first pilots hired under the new labor agreement and would have seniority based upon their initial training dates. We note that the Agreement modifies the seniority dates of each member of the Group of 570 to the "actual 'recall' date of the first member of the 'Group of 570' (11/9/85) in accordance with the original order of the District Court." Because the Agreement purports to fix and settle for all time the seniority dates of each member of the Group, and because the Group challenges the validity of that date and seeks an earlier one, its claim must necessarily relate to the Agreement. Thus, the Group of 570's claim is barred by the plain language of the release.

Each release signatory received a copy of the 1987 Agreement along with the release form. The Agreement language is even broader than the language in the releases and indicates a clear intent by the parties to release claims such as the ones asserted here.

### III

We agree with the court of appeals that summary judgment is appropriate because the 1987 releases effectively bar this action. The 1987 releases are valid and encompass the claims the Group of 570 advanced in the trial court. Where a valid release which would defeat the cause of action is asserted as an affirmative defense, the court has a duty to grant a judgment based thereon. *See Ulibarri v. Christenson*, 2 Utah 2d 367, 275 P.2d 170, 171 (1954).

Consequently, we do not consider whether these claims are barred by the doctrine of *res judicata*. The judgment of the court of appeals is affirmed.