IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| NORTH AMERICAN FIRE ULTIMATE HOLDINGS, LP, | § § § | No. 142, 2025 |
| Plaintiff Below, Appellant, | § § § § | Court Below—the Court of Chancery of the State of Delaware |
| v. | § § | |
| ALAN DOORLY, | § § | C.A. No. 2024-0023 |
| Defendant Below, Appellee. | § § § | |

Submitted: November 5, 2025
Decided: February 3, 2026

Before **SEITZ**, Chief Justice; **VALIHURA**, **TRAYNOR**, **LEGROW**, and **GRIFFITHS**, Justices, constituting the Court *en Banc*.

## ORDER

After consideration of the parties' briefs and the record on appeal, and following oral argument, it appears to the Court that:

1.      North American Fire Ultimate Holdings, LP ("North American Fire") appeals from a Court of Chancery decision dismissing its amended complaint for failing to state a claim for relief under Rule 12(b)(6).  North American Fire filed the action against its former employee for violating restrictive covenants under an Incentive Unit Grant Agreement.  The agreement granted the employee common units of North American Fire in exchange for an agreement to abide by certain

restrictive covenants.[1] The Court of Chancery dismissed the amended complaint because it found that the restrictive covenants were unenforceable as a matter of law due to a lack of consideration at the time North American Fire enforced the agreement. Because consideration is measured at the time of contracting and not at the time of enforcement, we reverse and remand for further proceedings.

2. Alan Doorly worked at Cross Fire & Security, Inc. ("Cross Fire"), a company he co-founded with his brother, for approximately twenty years. Cross Fire designed, installed, and serviced life safety systems, such as fire alarms and smoke detectors. In May 2021, North American Fire acquired Cross Fire and operated it as a stand-alone business. Under the acquisition agreement, Doorly continued in his position at Cross Fire and acquired 700,000 common units of North American Fire.

3. In February 2022, North American Fire reorganized its corporate structure. As a part of the restructuring, Doorly exchanged all his common units for 300,000 Class B units of North American Fire, which were subject to time and performance vesting requirements (the "Units").[2] The exchange transaction was

---

[1] App. to Am. Opening Br. at A33–37 [hereinafter "A__"] (Verified First Am. Compl. ¶¶ 69–88 [hereinafter "Am. Compl."]). For purposes of this order, we accept all well-pleaded allegations of fact as true.

[2] A18 (Am. Compl. ¶ 16).

governed by an Incentive Unit Grant Agreement (the "Agreement").[3]  When Doorly executed the Agreement, he agreed to be bound by restrictive covenants, which included restrictions on "the use of confidential information, non-solicitation of employees and customers, and non-competition."[4]

4.     About a year later, North American Fire promoted Doorly to Senior Executive and Business Unit Leader at Cross Fire.  A few months after his promotion, Doorly started planning to leave Cross Fire and start a competing company.  By May 2023, Doorly had formed an entity called "Empire Fire Alarm Specialist, LLC" ("Empire").  When North American Fire discovered Doorly's actions in December 2023, they terminated him.[5]  North American Fire classified it as a for-cause termination.  Doorly's for-cause termination triggered an automatic forfeiture of both his vested and unvested Units under the Agreement.[6]

6.     In January 2024, North American Fire filed a complaint against Doorly for breach of contract and breach of the implied covenant of good faith and fair dealing, and sought a declaratory judgment to toll the timeframe within which it could enforce the restrictive covenants (the "Contract Claims").  North American Fire also claimed that Doorly tortiously interfered with its prospective contractual

---

[3] *See* A40–67 (Incentive Unit Grant Agreement) [hereinafter "Agreement"].

[4] A18 (Am. Compl. ¶ 17).

[5] A27–28 (Am. Compl. ¶¶ 47–48).

[6] A28 (Am. Compl. ¶ 48 (citing Agreement § 3)).

business relationships (the "Tort Claim"). Doorly filed a motion to dismiss the Contract and Tort Claims. Instead of filing a response, North American Fire amended its complaint. Doorly filed a second motion to dismiss.

7. In March 2025, the Court of Chancery dismissed North American Fire's amended complaint. As to the Contract Claims, the court held that the Units were the sole consideration for the restrictive covenants, and that once North American Fire declared that Doorly had forfeited the Units, the contract became unenforceable for lack of consideration.[7] The court relied on Section 6 of the Agreement, which governed "Restrictive Covenants," as evidence that the Units were the sole consideration for the covenants.[8] The court dismissed the Tort Claim for lack of personal jurisdiction because "the contacts relevant to the tortious interference claim [were] entirely divorced from Delaware."[9] North American Fire appealed only the dismissal of the Contract Claims to this Court.

8. North American Fire raises two claims on appeal. First, it contends that the Court of Chancery erred when it assessed consideration at the time of the alleged

---

[7] *N. Am. Fire Ultimate Holdings, LP v. Doorly*, 2025 WL 736624, at *3 (Del. Ch. Mar. 7, 2025).

[8] *Id.* at *4 (quoting Agreement § 6(a) ("the Incentive Units being granted herein constitute[] adequate and sufficient consideration in support of such covenants and agreements") (alteration in original)).

[9] *Id.* at *5–6.

breach of the restrictive covenants.[10]  Instead, it argues, "the existence of consideration is measured at the time of contract formation, not the time of breach."[11] Second, North American Fire contends that the Court of Chancery incorrectly concluded that Doorly did not receive any consideration other than the Units in exchange for the restrictive covenants.[12]

9.     We review questions of law—including rulings on a motion to dismiss and a trial court's interpretation of a contract—*de novo*.[13]  "[T]he formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and [] consideration."[14]  It is a "general principle[] of contract law that

---

[10] Doorly argues that North American Fire waived its primary argument that consideration is determined when the contract is formed because North American Fire did not focus on that issue before the Court of Chancery.  Answering Br. 15 (June 20, 2025).  We disagree.  Although it is true that North American Fire's argument below focused on the language of the Agreement itself, its consistent objections to the "broader issue" (i.e., whether the Agreement was supported by consideration) sufficiently preserved the "precise argument" it makes on appeal—consideration is evaluated at formation.  *See* A79–87 (Pl. N. Am. Fire Ultimate Hldgs., LP's Answering Br. in Opp'n to Def. Alan Doorly's Mot. to Dismiss 5–13 (Apr. 30, 2024)).

[11] Am. Opening Br. 4 (May 21, 2025).  Doorly is not arguing that the consideration was inadequate when the Agreement was formed.  Neither party disputes that adequate consideration was exchanged at formation and a valid contract existed at that point in time.  Oral Arg. 7:49–8:16 (Nov. 5, 2025) (North American Fire's counsel expressing his view that both himself and the court presumed valid consideration at the time of contracting), 23:44–24:40 (Doorly's counsel stating his view that the court viewed the contract as valid at formation), *available at* https://courts.delaware.gov/supreme/oralarguments/.  The parties' agreement flows logically from fundamental principles of contract law.  *See Moscowitz v. Theory Ent. LLC*, 2020 WL 6304899, at *12 (Del. Ch. Oct. 28, 2020) ("It is the blackest of black-letter law that an enforceable contract requires an offer, acceptance, and consideration.").

[12] Am. Opening Br. 4–5.

[13] *Urdan v. WR Cap. Partners, LLC*, 244 A.3d 668, 674 (Del. 2020).

[14] RESTATEMENT (SECOND) OF CONTRACTS § 17 (1981).

5

consideration must be measured at the time the parties enter into their contract and that the diminished value of the economic benefit conferred, or even a complete lack of value, does not result in a failure of consideration."[15]   Importantly, therefore, consideration is measured at the time of formation and is not reevaluated at the time of enforcement.[16]

10.   To support this proposition, North American Fire cites *Newell Rubbermaid Inc. v. Storm.*[17]  We find *Newell* instructive.[18]  There, the plaintiff sought

---

[15] *Weinstein v. KLT Telecom, Inc.*, 225 S.W.3d 413, 415–16 (Mo. 2007).  A failure of consideration did not occur in this case.  *See* 17 WILLISTON ON CONTRACTS § 51:18 (4th ed.) ("It does not aid the purchaser to show that the stock did not fulfill his or her expectations, or was not as valuable as the purchaser thought, that the venture turned out badly, or was not as profitable as expected, that the stock has depreciated in value, or even that it has become worthless since the contract was made."); 12A FLETCHER CYC. CORP. § 5574 ("The fact that the stock turns out to be worthless, or has depreciated in value or become worthless since the contract was made does not amount to a failure of consideration.  Nor does the fact that the stock was intrinsically worthless when sold, if it had a market value.").

[16] *Cunningham v. Esso Standard Oil Co.*, 118 A.2d 611, 613 (Del. 1955) (affirming court's order of specific performance and declining to reevaluate consideration at the time of performance); *Wilkes v. German*, 316 A.2d 200, 203 (Del. 1974) (affirming court's order of specific performance to convey real estate by quitclaim deed and declining to reassess the property's value at the time of settlement); *Estate of Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) ("Mere inadequacy of consideration, in the absence of any unfairness or overreaching, does not justify a denial of ... specific performance where in other respects the contract conforms with the rules and principles of equity.");  *Glenn v. Tide Water Associated Oil Co.*, 101 A.2d 339, 344 (Del. Ch. 1953) (same); *see also W. Fed. Sav. & Loan Ass'n of Denver v. Nat'l Homes Corp.*, 445 P.2d 892, 897–98 (Colo. 1968) ("Consideration is not to be measured in the light of the eventual success or failure under a contract but rather consideration is measured as of the time of making the contract. . . ." (citation omitted)).

[17] 2014 WL 1266827 (Del. Ch. Mar. 27, 2014).

[18] Doorly (and the Court of Chancery) relied on *NBTY, Inc. v, Vigliante* for the proposition that restrictive covenants are not enforceable when the sole consideration for those covenants is unexercised and expired stock options.  Answering Br. 14–15 (citing *NBTY, Inc. v. Vigliante*, 2015 WL 7694865, at *3 (N.Y. Supr. 2015)).  Yet, it is not clear whether *NBTY, Inc.* ultimately measured

6

to enjoin a former employee from violating restrictive covenants contained in several restricted stock unit ("RSU") agreements.[19] Like incentive units, RSUs are a promise of equity in the company subject to vesting, which is often measured by time or performance.[20] The former employee asserted that the RSU agreements lacked consideration and were unenforceable because the RSUs were subject to vesting periods.[21] Under the agreements, if plaintiff was terminated for any reason before the vesting period, then the RSUs were automatically forfeited.[22] The Court of Chancery rejected the former employee's argument, observing that at the time of formation the former employee "was granted a benefit that held actual value."[23] The court noted that although "value is somewhat contingent, based on certain factors

---

consideration at the time of enforcement. The court's holdings appear to support that, in the court's view, no benefit was received at the time of formation. *See* 2015 WL 7694865, at *3 ("NBTY seeks to enforce an agreement that has already expired and *for which the individual defendants received no benefit that had any actual value*" (emphasis added)).

[19] *Newell*, 2014 WL 1266827, at *1.

[20] A Restricted Stock Unit (RSU) "is the right, subject to the terms and conditions of the Plan and this Agreement, to receive, as determined by the Company, either a payment of a share of Common Stock for each RSU or cash equal to the Fair Market Value of a share of Common Stock on the date of vesting of the Grantee's award, or a combination thereto. . . ." 2013 Restricted Stock Unit Award Agreement, *Newell Rubbermaid Inc. v. Storm*, C.A. No. 9398 (Del. Ch. Mar. 27, 2014), Dkt. No. 12, Ex. E; *see also Restricted stock*, BLACK'S LAW DICTIONARY 1714 (11th ed. 2019).

[21] *Newell*, 2014 WL 1266827, at *1.

[22] *Id.*

[23] *Id.* at *9.

such as the time period in which the units will vest and [the former employee's] likelihood of future employment . . . [it was] not illusory."[24]

11.    Doorly attempts to distinguish *Newell* by arguing that the plaintiff there, before the forfeiture, had also received "the cash equivalent of dividends."[25]  By contrast, Doorly argues that "the clawback at issue here dispossessed [him] of *all* consideration he had received."[26]  However, the former employee's receipt of a dividend equivalent was an independent form of consideration and was not material to the court's holding that "[a]lthough the [RSU] agreements contemplate a contingency . . . the inclusion of such a contingency does not convert the RSUs into illusory consideration."[27]  Here, like *Newell*, although the value of the Units was "somewhat contingent," it was not illusory at the time of formation.[28]  The Court of Chancery erred in evaluating whether the Agreement was enforceable by determining whether there was consideration at the time of enforcement.

---

[24] *Id.* at *2, *9.

[25] Answering Br. 18.

[26] *Id.* (emphasis in original).

[27] *Newell*, 2014 WL 1266827, at *9.

[28] *Id.*

8

NOW, THEREFORE, IT IS ORDERED that the judgment of the Court of Chancery is **REVERSED**, and the case is **REMANDED** for further proceedings.

BY THE COURT:

*/s/ N. Christopher Griffiths*
Justice