JOHN C. CUNNINGHAM, JR. and LYDIA CUNNINGHAM, his wife,
Defendants Below,
Appellants,

*vs.*

ESSO STANDARD OIL COMPANY, a corporation of the State of
Delaware, Plaintiff Below,
Appellee.

*Supreme Court of Delaware, December 9, 1955.*

*C. Edward Duffy* and *Stephen E. Hamilton, Jr.,* Wilmington (*J. Pearce Cann,* Wilmington, on the brief), for appellants.

*Morris Cohen,* of Cohen & Cohen, Wilmington (*Thomas Herlihy, Jr.,* Wilmington, on the brief), for appellee.

SOUTHERLAND, C. J., and WOLCOTT and BRAMHALL, JJ., sitting.

SOUTHERLAND, Chief Justice: The question in this case is whether the Vice Chancellor should have refused to decree specific performance on the ground that the circumstances of the case made it inequitable to do so.

The facts are these:

At the time of the execution of the contract in 1940 John C. Cunningham, Jr., was operating a service station in Newark, under a rental agreement with Sinclair Refining Company. His business experience prior to this operation had been slight. He had done well with the rented station. He was approached by a Mr. Spath

on behalf of Esso Standard Oil Company. Esso needed a gasoline service station in Newark as an outlet for its products. Spath suggested to Cunningham that it was ridiculous of Cunningham to pay rent when he could acquire his own service station and build up an equity in it. Cunningham was interested. Spath secured an option to buy certain land for $8,500. This option he assigned to Cunningham. Cunningham paid $2,000 toward the purchase price, and a $6,500 mortgage provided the balance of the purchase price. Cunningham needed further financial assistance to build the station. A mortgage of $13,000 was obtained, and the prior mortgage was paid off.

To finance the $13,000 mortgage, and to carry on the contemplated operation of the service station, the following arrangement was entered into. On August 8, 1940 Cunningham leased the land to Esso for ten years, with an option to renew the lease for five successive one-year periods. The rental was $128 a month—the amount necessary to amortize the mortgage. The rental payments from Esso were assigned to the mortgagee as additional security for the loan. Esso then released (or sublet) the property to Cunningham at the same rental. This sublease, however, was for one year only with a provision for renewal from year to year unless terminated by either party.

Cunningham's testimony indicates that without this financial aid he would have been unable to buy the property.

The station was built and Cunningham operated it from February 21, 1941, when it was opened, until December 1942, when he went into the military service. In 1945 Cunningham resumed operation of the station as sublessee. In 1949 he sublet the station to a third party at a yearly rental of $4,500, which he is now receiving.

The first lease, from Cunningham to Esso, contains the option that is the subject of the dispute. Esso was granted the right to purchase the land and personal property for $20,000 at any time during the original term of the lease or any renewal thereof by giving appropriate notice in writing. On March 1, 1954, Esso gave the re-

quired notice of its election to purchase. Cunningham refused to convey, and suit followed.

Cunningham's general defense to the suit was that it would be inequitable under the circumstances to grant specific performance. Several contentions in support of this defense were urged before the trial court and are renewed here.

1. *Assurances by Spath, Esso's agent, that the option would not be exercised.*

■ The lease of August 8, 1940, was prepared by Spath and given to Cunningham. Cunningham took it to his attorney, Samuel Handloff, Esquire, and they went over it paragraph by paragraph. Handloff took exception to the provision for the option. Cunningham then went back to Spath and discussed with him the option provision. Cunningham objected to it. The details of the conversation that followed are to some extent in dispute, but its general purport is clear. Spath told Cunningham that Esso was not in the real estate business; that it wanted independent dealers; and that upon the expiration of the lease it would "more than likely" want an extension of it. From these assurances, Cunningham could have believed, and probably did believe, that Esso would not elect to exercise the option. But all this falls far short of showing misrepresentation or overreaching on Spath's part. Upon the nature of these "assurances", the Vice Chancellor said:

> "I am not convinced that Spath's representations went beyond a mere expression of opinion that the option would not be exercised."

As the Vice Chancellor pointed out, Spath's statements had a basis in fact, because it was Esso's general policy not to hold title to gasoline service stations, and it had seldom exercised in Delaware any of the many similar options that it held on service station properties.

Cunningham decided to sign the lease. He did not again consult his attorney, although he could readily have done so, because the

agreement was signed in the presence of Handloff, who was still acting as Cunningham's attorney, and who witnessed Cunningham's signature.

The almost irresistible inference from all this is that Cunningham concluded, in effect, to take the chance of the option being exercised, believing that it would not be exercised. As the Vice Chancellor said, Cunningham unfortunately disregarded his attorney's advice.

■ It is said that these assurances amounted, in effect, to a flat statement by Spath that the option provision "would go for nothing". The Vice Chancellor refused so to find. Moreover, an oral statement preceding the written contract that one of its provisions is not binding is of no legal effect. The contention that such a statement is binding runs afoul immediately of the very basis of the parol evidence rule. The writing itself necessarily determines that very subject to the contrary. IX *Wigmore, Evidence,* § 2435.

Something is said about the inducement held out by Spath to the effect that Cunningham would be able to build up an equity in his own business. This inducement is alleged to be inconsistent with the option agreement, since the harder Cunningham worked to build up the business, the more it became to the interest of Esso to exercise the option. This may be so, but all it shows is, as above stated, that Cunningham acted imprudently in agreeing to the option.

## 2. *Misrepresentation respecting the "Lambert Lease".*

It is said that Spath told Cunningham that Cunningham would "get the deal Lambert had"; and that there was no option provision in Lambert's lease. From this it is argued that Spath himself regarded the option as of no effect. As to this the Vice Chancellor said:

> "I am satisfied that Mr. Spath merely referred to such lease as a good proposition similar to the proposed arrangements with defendant."

■ The Chancellor's finding appears to dispose of this contention. In any event, we cannot understand how Cunningham can make

anything of Spath's statement, since it is admitted that Cunningham did not know that the Lambert lease contained no option to purchase.

3. *Hardship resulting from increase in the value of the property.*

It appears to be undisputed that the property to be acquired by Esso is now worth $73,000. But when the station was built its value was only $18,000. As to this increased value the Vice Chancellor said:

> "Testimony in the record as to the present value of defendant's gasoline service station merely reflects the general real estate picture in Newark today. Not only the cheapening of the dollar but rapid industrial and residential growth in recent years have at least doubled or tripled most real estate values in the Newark area. Defendants have made and could make no showing that plaintiff had any peculiar knowledge that enabled it to foresee this turn of events."

The Vice Chancellor accordingly applied the established rule that mere increase in land values, unaccompanied by other circumstances showing inequity, is not such hardship as justifies a court of equity in denying specific performance. See cases collected in 11 *A.L.R.2d* at pages 406-411. We are in accord with his conclusion. There is nothing in *Godwin v. Collins,* 3 *Del.Ch.* 189, or *Willard v. Tayloe,* 8 *Wall.* 577, 19 *L.Ed.* 501, inconsistent with this ruling. The former is a case of a bargain unconscionable when made. The latter case involved primarily the effect of the abandonment of gold as legal tender, but it was also shown that the property had greatly increased in value. As to this, Mr. Justice Field said that if the contract was fair when made, "the parties are considered as having taken upon themselves the risk of subsequent fluctuations in the value of the property, and such fluctuations are not allowed to prevent its specific enforcement."

We are not without some sympathy for a landowner who finds himself, after many years, divested of his property at a price substantially less than its value. But in this case his situation is the result of his own decision, made after consultation with his attorney and against the attorney's advice. He must be held to his bargain.

### 4. *Lack of or gross inadequacy of consideration for the option.*

Cunningham's argument that there was no consideration for the option is based upon the fact that the rental paid by Esso to him under the first lease was offset by the rental paid by him to Esso under the sub-lease. Hence it is said that no rent at all was paid, the covenant to pay rent was illusory, and the covenant could not afford consideration for the option. The point is pushed to the length of saying that the whole transaction (*i. e.,* the two leases) was a paper transaction without meaning between the parties.

■ This conclusion is manifestly unsound. The leases did not merge in the fee, nor did they cancel each other. Not only were the provisions and the length of terms different, but their purposes were different. The main lease from Cunningham to Esso, as above stated, enabled Cunningham to finance the building of the station. Moreover, even if the rent covenants are regarded as merely a guarantee by Esso to the mortgagee (and this is certainly very doubtful), such a guarantee was for Cunningham's benefit as well as Esso's. We can see no reason why it does not constitute consideration for the other covenants of the lease. The theory of this argument is not developed in the briefs, but it appears to be based upon the assumption that the lease contract is divisible—that is, that the agreement for the option is necessarily dependent solely upon the covenant to pay rent. Nothing in the lease supports such an assumption.

■■ The argument on inadequacy of consideration comes to this: That a purchase price of $20,000 for property worth $18,000 on or shortly after the granting of the option is grossly inadequate when the option is to run for a long period of years. We fail to see why this is so. The test is whether the consideration is adequate when the option is granted. In this case the option price represented a $2,000 profit on the investment. Moreover, when inadequacy of consideration is alleged, it must be gross inadequacy. *Glenn v. Tidewater Associated Oil Co., Del.Ch.,* 101 *A.2d* 339, 344. No fraud or overreaching is shown, and the price was clearly not grossly inadequate.

The argument really reduces to a reiteration of the contention already dealt with, *viz.*, that a great increase in the value of the land bargained for is sufficient in itself to defeat the enforcement of the option. This we have held to be unsound.

█ We are of opinion that none of the contentions pressed upon us justifies the conclusion that the Vice Chancellor exceeded the limits of judicial discretion in awarding the remedy of specific performance.

The judgment of the Court of Chancery is affirmed.