**Rose Emiliene WILKES, Defendant
Below, Appellant,**

v.

**Howard N. GERMAN et al., Plaintiffs
Below, Appellees.**

Supreme Court of Delaware.

Jan. 22, 1974.

Bruce M. Stargatt and Richard H. May,
of Young, Conaway, Stargatt & Taylor,
Wilmington, for defendant below, appel-
lant.

Nicholas H. Rodriguez, of Schmittinger
& Rodriguez, Dover, for plaintiffs below,
appellees.

HERRMANN, Chief Justice; CAREY, Justice; and CHRISTIE, Judge, sitting.

CAREY, Justice (delivering the opinion of the majority of the Court):

The appellant, Rose Emiliene Wilkes, was the defendant below in an action instituted by Howard N. German, James McGinnis, Franklin L. Shorley, Hartford E. Bealer, James C. Latham and Charles A. Holland, the appellees. The suit in the Court of Chancery sought specific performance of a contract to sell certain real estate in the resort area of Sussex County near Fenwick Island. The judgment in favor of appellees directed appellant to execute a quit-claim conveyance for the property.

The contract was entered into on July 25, 1963. At that time, the appellant's husband, Gilbert Wilkes, was still living; he joined in the agreement. He died after this suit was instituted, whereupon appellant became the sole owner as surviving tenant by the entirety. The contract of sale provided for settlement on or about September 15, 1963, but contained a clause reading as follows:

"It is understood, however, that should Sellers not be able to deliver insurable title for the premises above described to the Buyers on or before September 15, 1963 the time for settlement shall be automatically extended for such length of time as shall be necessary to obtain said insured title in the normal course of business."

The property involved contains about 28¾ acres, divided by Route 14. About 13 acres, improved by a modest dwelling, extend from the west side of Route 14 to Little Assawoman Bay; 3½ acres of that part is "fast" land, and the balance is low marsh. The other 15¾ acres extend from the east side of Route 14 to the ocean. At the time of trial in this case in January, 1971, the State in its suit against the appellant was claiming ownership of the entire 28¾ acres. However, before the lower Court's ultimate decision was made herein, the State abandoned its claim to the part on the west side of Route 14; it likewise gave up its claim to 3.34 acres immediately adjoining Route 14 on the east side of that road. The State still claims ownership of the remaining 12 acres, which lie between the Atlantic Ocean and the 3.34 acre tract, and which are undoubtedly more valuable than the remainder.

Settlement could not be made at the agreed time because of the status of the record title. The parties learned that the State planned to file legal action to establish its claim to the property. Such an action was in fact commenced in February, 1967, against the Wilkes and is still pending. See Wilkes v. State ex rel. State Highway Department, Del.Supr., 265 A.2d 421 (1970). Thereafter, considerable correspondence took place between attorneys for the parties concerning the matter of clearing the title.

Meanwhile, two other actions were being litigated; they concerned title to certain waterfront lands, and counsel felt that a decision of legal points raised therein might solve the problem of title to the lands herein involved. The ultimate decision in one case proved to be unhelpful. The other, State v. Phillips, was decided in favor of the State (see Del.Ch. 305 A.2d 644), and is now awaiting argument in this Court on appeal. If the judgment therein is upheld, the appellees herein, we are told, could receive a valid title only for the 3.34 acre tract and the 13 acre tract.[1]

The present action was brought on May 19, 1969, and was tried in January, 1971. The Chancellor ruled in appellees' favor, holding, *inter alia*, that there had been substantial appreciation of property values in

---

1. Nothing said in this opinion is intended to suggest or forecast the ultimate conclusion of this Court in the *Phillips* appeal. It has not yet been argued, and we have examined only the reported opinion of the lower Court.

this area between 1963 and 1969, but nevertheless entered the mandatory injunction. We are asked to reverse.

In listing the property with the real estate broker, the Wilkes had attached a document calling attention to certain title problems which were to be pointed out to a buyer. One question was whether the easterly boundary of the land extended to the water line of the ocean. The second problem related to an exchange of deeds between the Wilkes and the State of Delaware for certain portions of the land. The third matter was whether or not the State had a valid deed to the right-of-way for the highway which separates the two parcels. Apparently, the parties to the sales agreement, at the time of its execution, believed that only a short length of time would be needed to clear up the problems mentioned in that stipulation.

In April, 1966, the Wilkes suggested rescission of the agreement of sale. To this suggestion, the appellees replied that they had no intention of abandoning the agreement and were willing to wait until the title could be cleared.

In August, 1967, the Wilkes offered to convey the property subject to the pending law suit of the State. Appellees replied that they would await the outcome of the State's case. On July 10, 1968, through their attorney, the appellees offered to accept the title which the Wilkes were then able to convey by way of a regular deed for the part not claimed by the State, and a quit-claim for the balance. They received no answer until October, 1968, when appellant's counsel informed them that his clients desired him to do some additional research before replying to the offer.[2] The appellees received no further information concerning that offer and finally notified the Wilkes that they had scheduled settlement on February 28, 1969, at 2:00 p. m. to take the title which the Wilkes could then convey. The letter stated that they

had a survey for the lands and would have ready for signature two deeds as mentioned above. The Wilkes did not come to the settlement, personally or by counsel. This action was instituted soon thereafter.

About the time of the original agreement, the buyers paid $5,000 to sellers' attorney. In the spring of 1966, some letters were exchanged between the attorneys concerning disposition of this deposit. It was in the hands of sellers' attorney, who suggested that it be placed in a separate joint account in escrow with the interest thereon to be given to the Wilkes or the appellees, depending upon which of them was ultimately entitled to the principal. The money was deposited in that manner in August, 1967, and remains so deposited.

At the trial of this case, the purchasers indicated that they were willing to accept a quit-claim conveyance of such interest as the appellant owned, notwithstanding the pendency of the State's case. At that time, the State in its suit was still claiming all the lands which the Wilkes had agreed to sell the appellees, but the State later withdrew its claim to that portion of the land lying to the west of the highway and 3.34 acres next to, and east of the highway. The more valuable part, however, which lies between the highway and the ocean, is still involved in the litigation between the State and the appellant.

The appellant advances four reasons for a reversal of the judgment below.

I

■■■ The first contention made is that the contract automatically expired by its own terms when it became apparent that the sellers could not convey an insurable title in "the normal course of business." The Court below held, in effect, that this contract provision was for the protection of the buyers, and that it could be and was waived by them. Although they continued

---

2. In setting forth the facts, we mention only certain letters; there were, of course, many others of lesser importance.

for a time to insist upon an insurable title, they ultimately waived it. Throughout the correspondence, the appellees continued to demonstrate the belief that the agreement remained in effect; the sellers must have realized that fact, yet they made no attempt to return the deposit and never said that they considered the agreement ended. In fact, on April 20, 1966, the sellers suggested that the agreement be rescinded—a suggestion which the buyers promptly refused to accept. In fact, the suggestion is hardly consistent with a belief that the agreement was automatically ended.

In our opinion, there was adequate evidence in the record to justify the Chancellor's ruling on this contention. The cases[3] cited by the appellant on the point are factually different from the present case.

## II

■ Appellant contends that the evidence did not justify the ruling of the Court below that the parties had agreed upon an extension of time for final settlement. We have reviewed the record with this point in mind and we are of the opinion that, in view of the events outlined above, there was adequate evidence to support the Chancellor's ruling.

## III

In charging laches, the appellant relies upon three matters: (1) sellers expended large sums to defend their title; (2) they expended time and money in planting trees and doing other work which enhanced the value of the property; and (3) the value of the property increased greatly during the interim. She argues that it would be unfair to compel a conveyance now, in the light of those facts.

The sellers knew even before the contract of sale was made that a lawsuit was probably necessary in order to pass a clear title, and they must have known that such a suit would involve considerable expense; yet they entered into the contract which bound them to convey a fee simple.[4]

With respect to the planting of trees and the doing of other miscellaneous work on a part of the land, there was no testimony as to the amount of money or time required for that purpose. Here again, the expenditure was made after the contract of sale had been signed, apparently without consulting the buyers.

■■ It is a matter of common knowledge that property on or near the seashore in Delaware has increased greatly in value during the past few years. The Chancellor found, based upon the evidence, that the portion of these lands which is no longer claimed by the State has a *present* value of from $152,000 to $195,000, as against the total contract price of $112,000. The Chancellor did not determine the value of the land now claimed by the State, but as ocean front property it clearly is far more valuable than the part not so claimed. As to the latter, the pertinent question would be the value of the interest which appellant can presently convey, rather than the value of the fee simple. The estimates of total value given by the appraisers were based upon the assumption of a clear title. As we have indicated, if the decision in the *Phillips* case, *supra,* is ultimately affirmed, *and* if the material facts here are the same as those in *Phillips,* the State may well prevail in that suit. If so, the buyers would by no means receive what they expected when the contract was made. We have no doubt that the Chancellor considered all these matters in reaching his decision that the difference in value is not so great as to warrant a finding of undue hardship upon appellant. Furthermore, he placed some reliance upon the decision in Cunningham v. Esso Standard Oil Company, 35 Del.Ch. 371, 118 A.2d 611 (1955), in

---

3. Jakober v. E. M. Loew's Capitol Theater, Inc., 265 A.2d 429 (R.I.1970).; Stamato v. Agamie, 24 N.J. 309, 131 A.2d 745 (N.J. 1957).

4. We assume that, by accepting the quit-claim deed ordered by the Court below, the appellees will be obliged to bear the cost of further litigation in that action.

which this Court held that, in a suit for specific performance of a contract, the test to be used in determining an issue of inadequacy of consideration is whether that agreed price was adequate at the time when the option was granted—not the date of settlement. No evidence was presented in this case to show that at the time of the contract the sale price was less than its actual value.

■ In this connection, the appellant relies upon Giddens v. Estero Bay Estates, 5 Cir., 18 F.2d 265 (1927), but we do not consider that case to be pertinent here. There, the optionor, after a defect in title was discovered, specifically notified the optionee that the option would be ended on a certain date unless the latter accepted such title as the former owned. The optionee did not act within that time limit, but brought suit six months later for specific performance. Meanwhile, the owner had sold the property to someone else. The Court held that the original "buyer" had waited too long, especially in view of the considerable increase in market value during the interim. Those are not the facts here. Under all the facts, we cannot hold that the Chancellor's decision is reversible on the ground of laches.

IV

■ The final argument made by the appellant is that, assuming that the parties had agreed to extend settlement indefinitely, the agreement would violate the rule against perpetuities. She cites Emerson v. Campbell, 32 Del.Ch. 178, 84 A.2d 148 (1951) as authority for this view. We need not discuss this point at length. Here, the extension was limited to the time required to obtain the Court's decision on the title question. We see no valid reason why such an agreement violates the rule against perpetuities.

1. Dr. Wilkes is deceased; Mrs. Wilkes is the appellant.

For the foregoing reasons, the judgment below will be affirmed.

HERRMANN, Chief Justice (dissenting):

I would reverse on the ground of speculative delay and laches.

The appellee Franklin L. Shorley was the real estate broker with whom Dr. and Mrs. Wilkes [1] placed the listing to sell the property. The other appellees are real estate brokers and investors with whom Shorley associated himself in the purchase of the property.

The contract of July 25, 1963, specifying the sales price of $112,500., provided for a total cash payment of $25,000., the balance of $87,500. payable to the Wilkes over a ten year period, with interest at 6%. The listing specified the title problems encumbering the sale. It is undisputed that from the appellee-purchasers' point of view this was a speculative land transaction from the beginning.

On December 31, 1963, the Deputy Attorney General for Sussex County issued an opinion contesting on behalf of the State the title to all the Wilkes' beachfront land. The effect of the opinion was that the Wilkes were unable to deliver insurable title, as required by the contract; and the purchasers were unwilling to accept a quit claim deed.

The years 1964, 1965, and 1966 went by with no change in the position of the parties and no communication of any substance between them except as to the $5,000. deposit being held in escrow. During that period, Wilkes' attorney was engaged in an unsuccessful attempt to change the Attorney General's opinion on title. In February, 1967, the State filed suit against the Wilkes claiming title to all 28 acres of the property, both beachfront and bayside.[2]

2. This action is still pending, although in 1971 the State abandoned its claim to the bayside portion of the property and now limits its claim to the beachfront portion.

In the summer of 1967, the purchasers suggested that the Wilkes convey title to the undisputed portion of the property and accept a reduced purchase price. The Wilkes replied that this was impossible because all of the property was then in dispute; but a counter proposal was made by Wilkes in August, 1967, that the purchasers take such title as the Wilkes then had in the entire property, together with the law suit and its expense, without abatement of purchase price.[3] This counter offer was declined by the purchasers in September, 1967.

Again, there was a lapse of many months without any action by the parties. Finally, in July, 1968, the purchasers offered to take title in the form of a "special warranty deed to the undisputed land and a quit claim deed to the land currently in dispute". The Wilkes contended that they were unable to agree because title to all of the property was then in dispute. This action for specific performance was brought by the purchasers in April, 1969.

In the meanwhile:

(1) From the time of the Attorney General's opinion in December, 1963, to the present, the Wilkes have been engaged in continued, protracted, and expensive legal proceedings in defense of title to the property;[4] and

(2) During this litigation, the State abandoned its claim to the bayside portion of the property and the appellee-purchasers finally agreed to take a quit claim deed to the property, subject to the pending law suit; and

(3) During the years since 1963, when the sales contract was created, the property has appreciated in value substantially.[5]

To summarize: as early as 1963, the purchasers could have had the result to which they finally agreed during trial in 1971, i. e., a quit claim deed to the entire property, without abatement of purchase price and with the pending law suit. Such quit claim deed has been the only course of action available to the parties over the years. The purchasers failed to pursue that right and remedy until years after it was available to them; rather, they chose to rest secure in their "heads-we-win-tails-you-lose" position over the years, during which the Wilkes continued to protect and preserve the property.

I am persuaded that the equities are clearly with the appellant, Mrs. Wilkes, and that the appellee-purchasers have been guilty of inexcusable delay in asserting their right, i. e., laches sufficient to bar recovery within the classic definition stated in Wright v. Scotton, 13 Del.Ch. 402, 121 A. 69, 72 (1923):

"* * * Generally, if there has been unreasonable delay in asserting claims, or if, knowing his rights, a party does not seasonably avail himself of means at hand for their enforcement, but suffers his adversary to incur expense, or enter into obligations or otherwise change his position, or in any way by inaction lulls suspicion of his demands to the harm of the other, or if there has been actual or passive acquiescence in the performance of the act complained of, equity will ordinarily refuse her aid."

3. In substance, this 1967 proposal by the Wilkes was the conclusion and final judgment of the Court below.

4. The expense thereof to the Wilkes was estimated at about $30,000. Throughout, the appellee-purchasers made no effort to join in the defense of title or in the expense thereof.

5. According to expert witnesses, the 1969 value of the tract was somewhere between $749,000. and $1,119,000.