**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| TREVOR WHITE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2020-0462-SEM |
| | ) | |
| TERESA RUSSELL, and | ) | |
| CHARLES GRISDALE, | ) | |
| | ) | |
| Defendants. | ) | |

**MASTER'S FINAL REPORT**

Date Submitted: January 5, 2023
Final Report: May 2, 2023

Catherine M. Cramer, Brian V. DeMott, and J. Garrett Miller, BAIRD, MANDALAS, BROCKSTEDT, FEDERICO & CARDEA, LLC, Wilmington, Delaware; *Counsel for Plaintiff.*

Shane C. Herberling, PARKOWSKI, GUERKE, & SWAYZE, P.A., Rehoboth Beach, Delaware; *Counsel for Defendants.*

**MOLINA, M.**

Pending before me are the parties' cross-motions for summary judgment. The parties present three successive questions: (1) is the real estate contract enforceable, if so, (2) did the defendants breach it, if so, (3) is the plaintiff entitled to specific performance. I find the answer to all three questions should be "yes" and recommend the Court grant specific performance.

This is my final report.

I.    **BACKGROUND**[1]

The property at issue is located at 34826 North Road in Rehoboth Beach, Delaware (the "Property"). It is a corner lot within Midway Park, improved by a manufactured home, with an attached garage and a detached shed.[2] Charles Grisdale ("Grisdale") and Teresa Russell ("Russell" and collectively with Grisdale, the "Sellers") own the Property as joint tenants with the right of survivorship.[3] But Trevor White (the "Buyer," together with the Sellers, the "Parties") contends he has an enforceable contract to purchase the Property. I start with the Sellers' historical ownership of the Property and work my way forward to the matter at hand.

---

[1] I draw these facts from the exhibits attached to the underlying briefing. Docket Item ("D.I.") 42-43, 47. Citations to the various deposition transcripts will be in the form of Dep. Last Name. The remaining exhibits are cited as Pl. or Def. Ex. A-X.

[2] *See* Dep. Grisdale 7:20-8:7; Dep. White 25:20-23.

[3] Def. Ex. A.

## A. The Sellers' Ownership

Grisdale purchased the Property with his wife in the 1980s.[4] But it was never their primary residence; Grisdale and his wife would split their time between their Florida home and the Property.[5] For Grisdale, specifically, he retired approximately eighteen (18) years ago and for the last fifteen (15) years has resided in Florida and traveled north for the summer months.[6] In 2005, after his wife passed, Grisdale added Russell, his daughter, to the deed for the Property.[7] Like her father, Russell does not reside fulltime in the Property; she lives in Boyertown, Pennsylvania.[8] But Grisdale would visit Russell during the weekends at her home or their shared home in the Pocono area while he was up north.[9]

Grisdale's ability to travel back and forth between Florida and Delaware/Pennsylvania changed in 2019. His significant other in Florida was ill

---

[4] Def. Ex. A. There appears to be some uncertainty regarding when, precisely, Grisdale and his wife purchased the Property. *Compare* Dep. Grisdale 17:10-11 ("I've owned [the Property] since 1987, I believe it was. 1987.") *with* Dep. Russell 23:16-17 ("the original purchase date was 08-02-84").

[5] Dep. Grisdale 14:13-15:14.

[6] *Id.* at 14:13-18.

[7] Def. Ex. A.

[8] Dep. Russell 6:9-15.

[9] *Id.* at 21:6-21; Dep. Grisdale 15:16:22.

and he devoted considerable time to her and her care.[10]  This kept him from traveling as he normally would and he began to consider selling the Property.[11]

### B.    The Buyer Enters the Scene

The Buyer was looking to purchase a property near Rehoboth Beach. He already owned property at 6869 Marshall Street in Milford, Delaware, but he worked for the Delaware State Police in Lewes and was looking to buy property in a more convenient location.[12]  The Buyer was familiar with Midway Park and liked the area.[13]  And he was particularly interested in the Property, because it was a corner lot and has a porch and a garage.[14]

Neither the Buyer nor Grisdale can recall precisely how their discussions began.[15]  Both agree, though, that sometime in 2019 they became connected and started talking through texts and calls.[16]  Their discussions were initially productive, but they were sidelined in May of 2019 when Grisdale's significant other suffered a major stroke.[17]  Grisdale shared the news but assured the Buyer: "the house is still

---

[10] Dep. Grisdale 31:13-20; Dep. Russell 31:4-11; Pl. Ex. A at TW-155-56.

[11] Dep. Grisdale 19:19-20, 21:13-17.

[12] Dep. White 8:3-9:8.

[13] *See id.* at 25:6-7.

[14] *Id.* at 25:18-26:1.

[15] *Compare id.* at 10:20-12:12 *with* Dep. Grisdale 19:24-20:10.

[16] Dep. White 12:18-21; Dep. Grisdale 17-20.  *See also* Pl. Ex. A at TW-155-59.

[17] *Id.* at TW-155.

yours it's just going to have to be a while now it looks like before I can get up there."[18] Grisdale made the same assurances in June, emphasizing: "I can tell you I will never do nothing with the house until I can come up and get everything settled with you."[19]

The Buyer was patient while Grisdale dealt with his partner's illness. And, despite the stress in Grisdale's life, Grisdale continued to communicate his interest in selling the Property to the Buyer. He noted only one hesitation, based on a discussion with his accountant: "I talk[ed] to my accountant about selling a house he's now telling me if I sell the house now I got a pay [*sic*] probably $30,000 in . . . capital [gains] but I'm still gonna sell the house."[20]

These guarantees picked up steam as 2019 ended and 2020 began. Around that time, Russell entered the negotiations as Grisdale's power of attorney and co-owner of the Property.[21] Grisdale confirmed he would be in "Delaware Pennsylvania" in early January 2020 for about a week so the Parties could "get together and make things happen."[22] They did. While Grisdale was in the area, the

---

[18] *Id.*

[19] *Id.* at TW-156.

[20] *Id.* at TW-158.

[21] *Id.* at TW-161.

[22] *Id.* at TW-159.

4

Parties went to the Property, packed up some items for Grisdale, and left some items in the Property for the Buyer's future use and enjoyment.[23]

During that visit, the Buyer also accompanied the Sellers to the Delaware Department of Motor Vehicles (the "DMV") to work on transferring title for the manufactured home on the Property.[24] At the DMV, Grisdale executed a limited power of attorney in the Buyer's favor giving him authority to sign all documents as may be necessary to transfer ownership of the manufactured home.[25] Russell explained "even though it's a double wide modular, apparently when there was a single trailer on the [P]roperty, there was a title confusion or something that needed to change[.]"[26] With the authority granted to him under the limited power of attorney, the Buyer retired the mobile home's title.[27] Sussex County then reassessed the manufactured home on the Property as a "'C' grade home," declaring it was "no longer priced as a mobile home," and "for purposes of titling," would be "considered real estate."[28]

---

[23] *See* Dep. White 24:6-9; Dep. Grisdale 19:12-16; Dep. Russell 26:11-20.

[24] *See* Dep. Russell 27:15-24.

[25] Pl. Ex. E at RP-060; Pl. Ex. A at TW-033; Dep. Russell 27:18-28:23.

[26] Dep. Russell 27:19-23.

[27] Dep. White 17:15-17.

[28] Pl. Ex. A at TW-038-39.

During that January 2020 visit, the Parties also went to the Sussex County Assessment Division so that Grisdale could obtain a tax release.[29] The tax release verified that, as of January 9, 2020, no outstanding taxes were due on the Property.[30] With this paperwork in order, the Parties finally turned to memorializing the sale.

## C.    The Agreement

The Buyer took the lead, hiring the law office of May & Perza, P.A. (the "Firm") to draft an agreement of sale.[31] The Firm did so and circulated a proposed agreement on January 17, 2020, which provided that the Sellers would sell the Property to the Buyer for $165,000.00, with closing to occur on or before March 31, 2020 (the "Agreement").[32] The Agreement further required a "[d]eposit of $500 to be paid by the [Buyer], to be held by settlement attorney . . . until settlement."[33] The Agreement further specified that it was "not binding until signed by and delivered to all parties" (the "Acceptance Clause").[34] The Acceptance Clause further provides:

---

[29] Pl. Ex. A at TW-041; Dep. Grisdale 25:21-26-18; Dep. Russell 28:1-5. The tax release lists the Buyer as the buyer of the Property. Pl. Ex. A at TW-041.

[30] Pl. Ex. A at TW-041.

[31] *See id.* at TW-059-061.

[32] Pl. Ex. E at RP-001; Pl. Ex. F ("AGT").

[33] AGT at ¶4.

[34] *Id.* at ¶25.

"[w]hen accepted by all parties, this Agreement becomes a legal and binding document."[35]  The Agreement also had default provisions which provided:

> Purchaser's Default.  If Purchaser shall, for some reason not excused hereunder, fail or refuse to perform his obligations to Seller, and Seller shall not also be in default, all monies paid hereunder by Purchaser on account of the purchase price shall be retained by Seller as liquidated damages, whereupon, all rights and obligations hereunder shall cease and determine.[36]

> Seller's Default. If Seller shall, for some reason not excused hereunder, fail or refuse to perform his obligations to Purchaser, and Purchaser shall not also be in default, Purchaser shall either have all monies paid hereunder on account of the Purchase Price, together with such reasonable costs incurred in preparation for settlement (survey, inspections, appraisal, title search, and loan application fees), refunded forthwith.[37]

The Agreement provided it "shall be construed under and governed by the laws of the State of Delaware."[38]

The Buyer emailed the Agreement to the Sellers who then signed the Agreement and delivered their signed copy to the Buyer on February 3, 2020.[39] Russell, as Grisdale's power of attorney, signed on the Sellers' behalf; Grisdale

---

[35] *Id.*

[36] *Id.* at ¶11.

[37] *Id.* at ¶12.

[38] *Id.* at ¶22.

[39] Dep. Russell 33:6-34:9; Def. Ex. G.

confirmed he directed Russell to do so.[40]  The Buyer then signed and forwarded the Agreement, fully executed, to the Firm on February 6, 2020.[41]

After the Agreement was fully executed, the Parties worked toward closing. On or about February 19, 2020, Russell asked the Buyer if he had "any updates."[42] The Buyer responded that once an appraisal was completed, "the settlement should be 3/31/2020 or before," to which Russell responded "Ok. Thanks."[43]  One day later, on February 20, 2020, the Firm emailed the Sellers congratulating them on the sale and including additional instructions to prepare for closing.[44]  Four (4) days later, the Buyer sent the $500 deposit to the Firm to be held in escrow until closing.[45]  The Property was then appraised and valued, as of February 27, 2020, at $165,000.00, matching the purchase price.[46]  Continuing to move the transaction forward, on March 12, 2020, Russell submitted various forms requested by the Firm.[47]  One week later, she emailed the Firm, providing a revised tax form and asking the Firm's

---

[40] AGT; Dep. Russell 32:22-33:1, 34:18-21; Dep. Grisdale 27:24-28:1.

[41] AGT; Dep. White 21:1-18.

[42] Pl. Ex. A at TW-164.

[43] *Id.*

[44] *Id.* at TW-059; Pl. Ex. E at RP-005-007.

[45] Pl. Ex. A at TW-153.

[46] *Id.* at TW-001-018.

[47] *Id.* at TW-236.

paralegal to "[p]lease advise on next steps."[48]  On his end, the Buyer completed all the requirements of his lender.[49]

### D.    The Deal Falls Through

On March 22, 2020, three (3) days after Russell provided the revised tax form and asked for an update, she told the Buyer the Sellers were withdrawing their offer to sell the Property.[50]  The conversation was audio recorded and, in pertinent part, went as follows:

> [Russell]: I can make this very quick. And, I am sorry to make this call. My father has decided that he is not going to proceed with the sale of that house. It has less to do with anything that has been discussed over the last few days and more to do with what's happening in his life.  He is going to be moving back north effective tomorrow or next Tuesday… depends when we can get him up here. He is still debating if he is personally going to reside in that house or if he is going to go back and forth like he used to.
>
> [The Buyer]: I'll be honest that's a little crazy nine days before settlement. I'll be honest. I tried to do the right thing assuming that I would get it on the return side. But, it is what it is. I'll be talking with [the Firm] to see where we need to do. I'm not trying to be smart but I've been setting up my place to rent it and it's a little crazy nine days before settlement. I appreciate the call. Thank you.[51]

The transaction never closed.

---

[48] *Id.* at TW-243.  It is unclear if there was any response.

[49] *See id.* at TW-149-150.

[50] Pl. Ex. E at RP-047. There were rumblings shortly before that the Sellers may back out. *See* Pl. Ex. A at TW-180-182.

[51] Pl. Ex. E at RP-047. It appears it was only in or around May 2020 when the Sellers began questioning the deposit and delivery of the fully executed contract. *See* Pl. Ex. A at TW-183-186.

## E.     The Aftermath

After the Sellers withdrew, the Buyer explored his options, among which was to look for another property in the same area.  He found one located "on the opposite corner lot" from the Property, at 34835 West Isaacs Drive (the "Second Property").[52] It was a vacant lot.[53]  Nevertheless, the Buyer purchased the Second Property for $123,000.00 on May 7, 2021, sold his home in Milford, and improved the Second Property with a new manufactured home.[54]  The Buyer is still interested in the Property and wishes to move forward with the Agreement.[55]  If he owned both the Property and the Second Property, he would live in one and rent the other out, like he had planned for the Property and his Milford home originally.[56]

The Sellers have also made moves since the failed transaction. Despite Russell's representations, Grisdale never did move north. Rather, following their withdrawal, the Sellers began renting the Property on a month-to-month basis through RE/MAX.[57]   The Property has been rented out fulltime since June 28,

---

[52] Dep. White 26:2-16, 7:10-16.

[53] Pl. Ex. G.

[54] Pl. Ex. G, H, I.  The Buyer also rented nearby property. *See* Dep. White 7:2-19.

[55] Dep. White 30:19-24.

[56] *Id.* at 14:8-11, 15:17-19, 31:1-5. *See also* Pl. Ex. A at TW-030.

[57] Dep. Russell 11:14-12:10; Dep. Grisdale 9:9-21.

2020.[58]  Because the Property is rented, Grisdale stays with Russell when he travels up north.[59]  Although the rental has provided the Sellers with additional funds, it has not been without incident.[60]  Russell explained that the tenants have made many requests for repairs and have "done a lot of damage, and for [Grisdale] to move back in, it will take a lot of repair."[61]

## F.  This Action

The Buyer filed a complaint seeking specific performance of the Agreement, and other relief, on June 12, 2020 (the "Complaint").[62]  The Sellers answered the Complaint and counterclaimed on July 31, 2020, denying that they breached the Agreement and counterclaiming that the Agreement is not enforceable.[63]

---

[58] Dep. Russell 12:17-19. Before they began renting the Property, the Sellers had it appraised; as of June 25, 2020 it was valued at $200,000.00.  Pl. Ex. E at RP-067-101.

[59] Dep. Grisdale 15:16-18; Dep. Russell 15:8-11.  At his December 2021 deposition, Grisdale testified that he was able to move back north because of his partner's condition. Dep. Grisdale 32:15-19.  Although initially testifying that his partner "was no longer with" him; Grisdale clarified that his partner was "still living, but barely." *Id.* at 31:24-32:14. Per the Sellers' opening brief, she has since died.  D.I. 47 at p. 5.

[60] *See* Dep. Russell 46:2-10.

[61] Dep. Russell 46:8-10. The extent of this damage is unclear.

[62] D.I. 1. The Complaint was amended on November 5, 2021 to reflect that Grisdale and Russell own the Property as joint tenants with the right of survivorship. D.I. 23. *See also* D.I. 22.  The Sellers answered and restated their counterclaim on November 22, 2021. D.I. 26. The pleadings closed with the Buyer's answer to the counterclaim on November 24, 2021. D.I. 29.

[63] D.I. 9.

On August 30, 2021, I approved the Parties' proposed schedule, initially setting an August 2022 trial date.[64] But after discovery, the Parties agreed to release the trial date and submit their claims through cross-motions for summary judgment.[65] The cross-motions were fully briefed on October 4, 2022.[66] I heard oral argument on January 5, 2023, at which time I took the matter under advisement.[67]

## II.    ANALYSIS

Summary judgment may be granted where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."[68] Where cross-motions for summary judgment are filed and the parties do not argue issues of material fact are in dispute, "the Court shall deem the motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with the motions."[69]

Under this lens, I first address whether the Agreement is an enforceable contract. It is. Thus, I turn to whether the Sellers' performance was excused. It was

---

[64] D.I. 17.

[65] *See* D.I. 34.

[66] D.I. 52.

[67] D.I. 56.

[68] Ct. Ch. R. 56(c).

[69] Ct. Ch. R. 56(h).

not, leading me to the final issue: the Buyer's request for specific performance. I find specific performance should be granted.

## A. The Agreement is an enforceable contract.

"Where there are no genuine issues of material fact, Delaware courts can rule on contract formation as a matter of summary judgment."[70] A contract is formed where "(1) the parties intended that the contract would bind them, (2) the terms of the contract are sufficiently definite, and (3) the parties exchange legal consideration."[71] Only factor (1) is disputed—the Sellers argue that, under the Acceptance Clause, the Agreement was not binding until the fully executed version was delivered to all the Parties. The Sellers argue that because they revoked their offer to sell the Property before the fully executed version was delivered to all the Parties, the Agreement is not binding. I disagree and find the Agreement is a valid, enforceable contract.

"When a contract's language is clear and unambiguous, the court will give effect to the plain meaning of the contract's terms and provisions."[72] But "when we may reasonably ascribe multiple and different interpretations to a contract, we will

---

[70] *Fairstead Cap. Mgmt. LLC v. Blodgett*, 288 A.3d 729, 747 (Del. Ch. 2023) (citations omitted).

[71] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010).

[72] *S'holder Representative Servs. LLC v. HPI Hldgs., LLC*, 2023 WL 3092895, at *4 (Del. Ch. Apr. 26, 2023) (citations omitted).

find that the contract is ambiguous. An unreasonable interpretation produces an absurd result or one that no reasonable person would have accepted when entering the contract."[73] I find the Acceptance Clause is unambiguous and the Sellers' interpretation thereof is unreasonable.[74]

The Acceptance Clause provides, in full: "This Agreement is not binding until signed by and delivered to all parties. A facsimile or photocopy of a document shall constitute an original. When accepted by all parties, this Agreement becomes a legal and binding document."[75] The Sellers' argument that this language should be construed to require the fully signed contract be sent to all the Parties, lest their prior signatures be voided, is unreasonable. The Parties manifested their intent to be bound by signing the Agreement.[76] No reasonable person would accept a provision that could vitiate that intent through a clerical error.[77] The Agreement is binding.

---

[73] *Osborn*, 991 A.2d at 1160.

[74] I decline to wade into the Parties' dispute regarding who was the offeror or the offeree. D.I. 48, p. 6; D.I. 52, p. 4. Regardless of who made the offer, it was accepted, the Parties all intended to be bound, and the Agreement, by its own terms, is binding and enforceable.

[75] AGT at ¶25.

[76] The Sellers argue that the Buyer's failure to send his signed version to the Sellers manifested his intent not to be bound. D.I. 47, p. 5. I disagree. The Buyer signed after the Sellers and sent the fully executed version to the Firm, which was handling the transaction. Such is indicative of an intent to be bound.

[77] I find further support in the Delaware Supreme Court's analysis in *Weinberg v. Waystar, Inc.*, 2023 WL 253400 (Del. Mar. 16, 2023). Therein, the Court painstakingly addressed interpretation of the word "and" under Delaware law. It explained, "and" can be conjunctive or disjunctive and joint or several. *Id.* at *5. "And" as used in the Acceptance Clause is conjunctive and joint—the Agreement must both be signed by and delivered to

14

## B. The Sellers' performance was not excused.

The Sellers argue, alternatively, that they did not need to perform their part of the Agreement because the Buyer failed to fulfill a condition precedent—payment of the deposit. "Where the parties [to a contract] have created a condition precedent, the occurrence of that condition is necessary to give rise to the other party's duty to perform; if the condition does not occur, the duty never arises."[78] Determining whether a term is a condition precedent can be challenging; generally speaking, though, "if the condition must be satisfied before a duty of performance arises, the parties have created a condition precedent."[79] I look to the Agreement's terms and the Parties' intent reflected therein to determine if the deposit was a condition precedent.[80]

---

the Parties. But, importantly, the plain language does not require that the fully signed version be so delivered nor that the signing happen before the delivering; both must happen and once they do, the Agreement is binding. Both happened here—the Parties all received the Agreement and signed it. Thus, the Agreement is enforceable.

The Sellers appear to argue that the Buyer's text messages confirm that he knew he had to send the fully executed version to them for the Agreement to be binding. D.I. 47, p. 12. But the Agreement and, specifically, the Acceptance Clause is not ambiguous rendering such extrinsic evidence irrelevant. *See Thermo Fisher Sci. PSG Corp. v. Arranta Bio MA, LLC*, 2023 WL 2771509, at *17 (Del. Ch. Apr. 4, 2023) (pausing to highlight "why our courts have long held that extrinsic evidence may not be used to create ambiguity or to vary the meaning of an unambiguous term").

[78] *Ainslie v. Cantor Fitzgerald, L.P.*, 2023 WL 106924, at *10 (Del. Ch. Jan. 4, 2023).

[79] *Id.* at *11 (cleaned up).

[80] *Id.* at *10 (citation omitted).

The deposit was a condition precedent to closing. Within the section "Purchase Price," the Agreement provides for a deposit as follows: "Deposit of $500.00 paid by Purchaser, to be held by settlement attorney in Rule 1.15A Real Estate Trust Account, until settlement[.]"[81] Although this language does not include language such as "if," "provided that," or "on the condition that," which "generally indicate the parties have created a condition" it nevertheless contemplates the deposit occurring before settlement.[82] It is a mandatory obligation of the Buyer to provide the deposit before settlement and I find the Parties' intent, reflected in the Agreement, was that the deposit serve as a condition precedent to closing.[83]

I now turn to whether the Buyer failed to satisfy this condition, excusing the Sellers' performance. Other than indicating that the deposit be paid before closing, the Agreement does not set a deadline for such payment. "Where a contract is silent on the time given to a party to perform a condition, then this Court will assume that

---

[81] AGT at ¶4(a).

[82] *See id.*

[83] In so holding, I reject the Buyer's argument that the deposit could not be a condition precedent because it was part of the consideration, which "is an essential part of a contract, and a primary obligation which will arise upon satisfaction of conditions precedent[.]" D.I. 48, p. 12. The Agreement expressly provided that the deposit be paid before, and held in escrow until, closing, differentiating it from the exchange of consideration otherwise contemplated. AGT at ¶4(a). *See also Demarie v. Neff*, 2005 WL 5755317, at *6 (Del. Ch. Jan. 12, 2005) (holding the buyer's "failure to make timely payment of the deposit entitles [the seller] to avoid the [a]greement").

16

the parties contemplated a reasonable time."[84]  What is reasonable depends on the circumstances of the underlying transaction and the hardship imposed by the alleged delay.[85]

Here, the Agreement was fully executed on February 3, 2020, with closing set for March 31, 2020.  The Buyer provided the deposit to the Firm on February 24, 2020—21 calendar (15 business) days after signing and 35 calendar (25 business) days before closing.  The deposit was paid within a reasonable time after signing and before closing and it is inconceivable that the alleged delay imposed any hardship on the Sellers.[86]  Because the condition was satisfied within a reasonable time, the Sellers were not excused from performance.

## C. The Agreement should be performed.

"A party seeking specific performance must establish that (1) a valid contract exists, (2) he is ready, willing, and able to perform, and (3) that the balance of equities tips in favor of the party seeking performance."[87]  Specific performance is only available if there is no adequate remedy at law.[88]  Factor (1) has already been

---

[84] *LaPoint v. AmerisourceBergen Corp.*, 2007 WL 1309398, at *5 (Del. Ch. May 1, 2007), *aff'd*, 956 A.2d 642 (Del. 2008).

[85] *See id.*

[86] In so holding, I reject the Sellers' argument that a standard real estate contract should inform my analysis. *See Thermo Fisher Sci. PSG Corp.*, 2023 WL 2771509, at *17.

[87] *Osborn*, 991 A.2d at 1158.

[88] *Morabito v. Harris*, 2002 WL 550117, at *2 (Del. Ch. Mar. 26, 2002).

addressed. Factor (2) is not in dispute. Thus, I limited my analysis to factor (3)—

the equities, coupled with the adequacy of any remedy at law. Before doing so,

though, I dispose of the Sellers' argument that the Agreement excludes specific

performance as an available remedy.

### 1. The Agreement does not preclude specific performance.

The Sellers argue that the Parties excluded a claim for specific performance

in the Seller Default provision, which provides:

> If Seller shall, for some reason not excused hereunder, fail or refuse to perform his obligations to Purchaser, and Purchaser shall not also be in default, Purchaser shall either have all monies paid hereunder on account of the Purchase Price, together with such reasonable costs incurred in preparation for settlement (survey, inspection, appraisal, title search, and loan application fees), refunded forthwith.[89]

The Agreement further provides that it "shall be construed under and governed by

the laws of the State of Delaware."[90]

The Sellers point me to a standard real estate contract, which expressly

provides for equitable remedies, in support of their argument that this provision

should be read as excluding such relief. But, as already addressed, with an

unambiguous agreement, I am "constrained by a combination of the [P]arties' words

and the plain meaning of those words where no special meaning is intended."[91] I

---

[89] AGT at ¶12.

[90] *Id.* at ¶22.

[91] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006).

18

cannot look outside those words unless the Agreement is ambiguous. Here, the Agreement is not ambiguous.

Delaware law permits specific performance as an equitable remedy. Entitlement depends on the three (3) factors addressed above, rather than an enabling contract provision.[92] Although parties can bargain away their ability to seek specific performance, they must do so with "the requisite expression of exclusivity."[93] The Agreement does not have any such expression and it would be unreasonable to read the silence in the Seller Default provision as exclusionary of equitable remedies, particularly with the reference to overarching Delaware law. Without an express exclusion or waiver, I find the equitable remedy of specific performance is available.

### 2. The equities tip in the Buyer's favor and the Buyer's remedy at law is inadequate.

"In balancing the equities for specific performance, the Court must consider whether 'specific enforcement of a validly formed contract would cause even greater

---

[92] *Cf. Williams Cos., Inc. v. Energy Transfer Equity, L.P.*, 2016 WL 3576682, at *2 (Del. Ch. June 24, 2016), *aff'd*, 159 A.3d 264 (Del. 2017) ("Delaware is strongly contractarian, and the presence of a provision in favor of specific performance in case of breach, as the parties contracted for here, must be respected."); *Godwin v. Collins*, 1868 WL 1255, at *1 (Del. Ch. Mar. 1868) ("It is the established rule that a specific performance of a contract of sale is not a matter of course, but rests entirely in the discretion of the court upon a view of all the circumstances.") (cleaned up).

[93] *Oliver B. Cannon & Son, Inc. v. Dorr-Oliver, Inc.*, 336 A.2d 211, 214 (Del. 1975). *Cf. Abry P'rs V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1055 (Del. Ch. 2006) (finding an exclusive remedy provision would bar a claim for rescission, absent a public policy concern).

harm than it would prevent.'"[94] The Buyer bears the burden of proving the equities tip in his favor by clear and convincing evidence.[95] "To establish proof by clear and convincing evidence means to prove something that is highly probable, reasonably certain, and free from serious doubt."[96] The Buyer must also demonstrate that he lacks a full, adequate, and complete remedy at law.[97] I find he has and that the equities tip in his favor.

The contrasting holdings in *Morabito v. Harris* and *Szambelak v. Tsipouras* are instructive.[98] In *Morabito*, Chancellor Chandler adopted the Master in Chancery's recommendation that a specific-performance request be denied.[99] Therein, the equities tipped in favor of the sellers, who had a change in financial prospects and would be rendered homeless if the sale closed. The buyer's interest in the unique attributes of the property were less compelling, particularly with the other comparable options available to him. Chancellor Chandler emphasized "there is no 'entitlement' to specific performance, even when a contract breach involving

---

[94] *Hastings Funeral Home, Inc. v. Hastings*, 2022 WL 16921785, at *8 (Del. Ch. Nov. 14, 2022) (citations omitted).

[95] *Peden v. Gray*, 2005 WL 2622746, at *3 (Del. 2005) (citations omitted).

[96] *Utz v. Utz*, 2003 WL 22952579, at *3 n.11 (Del. Ch. Dec. 5, 2003).

[97] *Osborn*, 991 A.2d at 1158.

[98] *Morabito v. Harris*, 2002 WL 550117; *Szambelak v. Tsipouras*, 2007 WL 4179315 (Del. Ch. Nov. 19, 2007).

[99] 2002 WL 550117, at *3 (Del. Ch. Mar. 26, 2002).

unique goods is admitted. Specific performance is available when it is equitable, and in this case specific enforcement (to repeat) would be inequitable."[100]

In *Szambelak v. Tsipouras*, Vice Chancellor Noble highlighted *Morabito* as an outlier.[101] He explained: "Real property is unique; thus, specific performance of a real estate sale contract is often the only adequate remedy for a breach by the seller, except in rare circumstances."[102] To address whether the matter before him was such a rare circumstance, Vice Chancellor Noble looked at whether either side acted inequitably. He found the sellers did; the buyers did not. He explained "to the extent the [sellers] may have sought to avoid this transaction because they later found out that another buyer was willing to pay them an additional $100,000 for the [p]roperty,

---

[100] *Id.*

[101] *Szambelak v. Tsipouras*, 2007 WL 4179315, at *7. Such recognition was most apt. All the real-property cases that cite *Morabito* and reach the equitable-balancing prong of the specific-performance test have distinguished *Morabito* and found the equities favored the buyer(s) over the seller(s). *See Osborn*, 991 A.2d at 1162 (rejecting the seller's "robust argument" in favor of the buyer); *CC Fin. LLC v. Wireless Properties, LLC*, 2012 WL 4862337, at *9 (Del. Ch. Oct. 1, 2012) (finding the equities favored specific performance and emphasizing: "The Court recognizes that real property is unique, and often the law cannot adequately remedy a party's refusal to honor a real property contract. Further, equity respects the freedom to contract and teaches that parties should receive the benefit of their bargain through specific performance."); *Walton v. Beale*, 2006 WL 265489, at *7 (Del. Ch. Jan. 30, 2006), *aff'd*, 913 A.2d 569 (Del. 2006) (finding an order denying specific performance would harm the buyer more than granting such relief would harm the sellers); *Word v. Johnson*, 2005 WL 2899684, at *5 (Del. Ch. Oct. 28, 2005) (finding "[n]o consideration of equity tips the scales in [the seller's] favor: [the seller] will suffer no special hardship by being forced to fulfill a sale agreement he freely entered into for a property in which he no longer lives").

[102] *Szambelak v. Tsipouras*, 2007 WL 4179315, at *7.

21

the Court is in no position to relieve them of their now regretted business judgment."[103] At most, the sellers may have been unaware of the buyers' deposit and the buyers "could have taken additional steps to ensure that the [sellers] were aware of the deposit."[104] But "whether or not the [sellers] knew of the deposit was immaterial to their understanding that they were under contract to sell their [p]roperty to the [buyers]. The conduct of the [parties] in the days and weeks following the execution of the [a]greement of [s]ale confirms their understanding that a valid contract existed[.]"[105]

The same is true here. Unlike the sellers in *Morabito*, the Sellers are not facing homelessness or other irreparable injury with a compelled sale of the Property, at which neither of them reside. Nor did the Buyer act inequitably in anyway—he was at all times ready, willing, and able to perform the Agreement and he pursued his claims in this action with alacrity. The Buyer has presented clear and convincing evidence that specific enforcement of the Agreement would prevent greater harm to the Buyer, than it would impose upon the Sellers.

On the other hand, the Sellers acted inequitably in refusing to close and have failed to overcome the Buyer's showing with evidence that a compelled sale would

---

[103] *Id.* at *8.

[104] *Id.*

[105] *Id.*

22

cause even greater harm than it would prevent. The Sellers' conduct confirms that they knew they were under contract to sell the Property, yet they attempted to withdraw from the deal at the last minute. Their reasons for doing so fall far short of those found compelling in *Morabito*. As confirmed by their post-withdrawal conduct, the Sellers do not urgently need the Property for their shelter or protection. At best, they have found a new source of income and may regret their earlier decision to sell that income stream; this Court is in no position to relieve them of such regretted judgment. The Sellers also appear to regret the purchase price, considering the current market—another regret this Court cannot resolve.[106] These regrets appear to be the primary motivations; Grisdale's stated interest in residing in the Property to be closer to Russell is belied by the Sellers' decision to rent the Property to others and their joint ownership of other property in the Pocono area.

The Sellers argue the same can be said for the Buyer—because he was able to purchase the Second Property, he has no compelling need for the Property and, rather, has an adequate remedy at law for damages. I disagree. The Second Property does not have the same improvements as the Property—namely, the preexisting manufactured home, a porch, garage, driveway, and shed. Those unique attributes compelled the Buyer to enter into the Agreement, which the Sellers failed to perform.

---

[106] *Cunningham v. Esso Standard Oil Co.*, 118 A.2d 611, 614 (Del. 1955) ("mere increase in land values, unaccompanied by other circumstances showing inequity, is not such hardship as justifies a court of equity in denying specific performance").

23

Money damages would be inadequate to remedy the harm to the Buyer from such failed transaction. Thus, I find the Agreement should be specifically performed.[107]

## III. CONCLUSION

For the foregoing reasons, I recommend that the Buyer's motion for summary judgment be granted and the Sellers' motion for summary judgment be denied. The Agreement is binding and enforceable, the Sellers' performance was not excused, and, due to the unique nature of the Property, the Agreement should be specifically enforced.

This is a final report and exceptions may be filed under Court of Chancery Rule 144.

---

[107] The Buyer argues: "If the Court finds that an award of specific performance, alone, will not sufficiently remedy the harms [the Buyer] suffered due to [the Sellers'] breach, [the Buyer] requests that the Court award [the Buyer] the rental income [the Sellers'] received from the Property since the settlement date set in the Agreement." D.I. 48, p. 22. The Buyer also requests "monetary damages in the amount necessary to restore the Property to the condition it was in at the time the Agreement was executed." *Id.* at p. 23. I recommend that these requests be denied. The Buyer has failed to demonstrate that such additional recovery is warranted, particularly where any rental income received or damage to the Property would be offset by the increased market value not accounted for in the prior purchase price. *See Hastings Funeral Home, Inc.*, 2022 WL 16921785, at *9 ("Where the delay is on the part of the [seller], the purchaser is entitled to the rents and profits from the time when, according to the terms of the contract, possession should have been delivered, and the [seller] is entitled to a credit for the interest earned by the purchaser on the unpaid purchase money. [A] court of equity may award damages for what the purchasers have lost by reason of the seller's delay in conveying the property. And, equity may require a party to pay interest on the purchase price as a condition to obtaining specific performance where one party would otherwise inequitably receive a windfall at the other's expense.") (alterations in original, citations and quotation marks omitted).

24